Paul G. Shearer
1532 Meadows Drive
Lake Oswego, Oregon 97034
(503) 697-4378



UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

PAUL G. SHEARER,                          )
                                          )        Case No. A03-0263 CV (JKS)
            Plaintiff,                     )        (Consolidated)
                                          )
    vs.                                   )
                                          )
UNITED STATES OF AMERICA,                 )
GALE A. NORTON, Secretary of the          )
Interior, DEPARTMENT OF INTERIOR,         )
and, NATIONAL PARK SERVICE,               )        **PLAINTIFF'S OPPOSITION TO**
                                          )        **MOTION OF THE UNITED STATES**
            Defendants.                    )        **FOR PARTIAL SUMMARY**
_____  )        **JUDGMENT**

The United States has filed a Motion for Partial Summary (Docket 49) which presents

three legal arguments: first, plaintiff Paul Shearer did not execute a valid consent pursuant to the

Section 120 legislation with regard to parcels 2-21 identified in his First Amended Complaint,

and therefore his just compensation action should be dismissed as to these properties. Second,

Shearer's claim for just compensation as to parcels 4, 5 and 6 do not exist as a matter of law, and

therefore, his just compensation action should be dismissed as to these properties. Third,

Shearer's consent to taking of a 3% net smelter return (royalty) to the Galena lode claim is

ineffective because he did not own the royalty on the date of taking, and his consent did not

involve the entire property ownership. Shearer opposes the United States motion for partial

summary judgment for the following reasons:

1





## STANDARDS FOR SUMMARY JUDGMENT

Summary judgment pursuant to Rule 56, Fed.R.Civ.Proc., is proper if the pleadings, depositions, discovery responses, together with affidavits if any, show the absence of any genuine issue of material fact and the moving party is entitled to prevail as a matter of law.[1] Material facts are those which are relevant to an element of a claim or defense, and whose existence might affect the outcome of the case.[2]  In ruling on a motion for summary judgment, the court must view all evidence in the light most favorable to the opponent with all reasonable inferences resolved in that party's favor.[3]  The Ninth Circuit is "particularly cautious" when reviewing a grant of summary judgment if issues of intent or motivation are involved.[4]

The party moving for summary judgment has the initial evidentiary burden of showing the court that no evidence exists to support the essential elements of the non-moving party's case.[5]  If the movant has shown the absence of a genuine issue of material fact, the evidentiary burden shifts to the non moving party.[6]  To discharge its burden, the nonmoving party may not rest upon mere allegations or denials of his pleading, but must state specific facts cognizable

---

[1]     Fed.R.Civ.Proc. 56(c); *accord, e.g., Dodds v. Am. Broadcasting Co.,* 145 F.3d 1053, 1060 (9th Cir. 1998).

[2]     *E.g., U.S. v. Grayson,* 879 F.2d 620, 622 (9th Cir. 1989).

[3]     *E.g., Armstrong v. Burlington Northern RR Co.,* 139 F.3d 1277, 1278 (9th Cir. 1998).

[4]     *E.g., Dytrt v. Mountain States Tel. & Tel. Co.,* 921 F.2d 889, 896 (9th Cir. 1990).

[5]     *E.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).

[6]     *E.g., Musick v. Burke,* 913 F.2d 1390, 1394 (9th Cir. 1990).



according to Civil Rule 56(c).[7] The court should resolve a disputed factual issue in favor of the non moving party where the facts specifically averred contradict the facts specifically averred by the movant.[8] This standard has been construed to mean that a reasonable juror would draw all inferences in favor of the non movant and therefore would return a verdict in favor of that party.[9]

**OPPOSITION ARGUMENT**

**I. SHEARER'S CONSENT UNDER SECTION 120 IS VALID
AS CONSTRUED IN HIS FIRST AMENDED COMPLAINT**

A.    *Northwest Exploration* **Looks for Law to Apply in
Construing a Valid Consent under Section 120.**

The Section 120 legislation[10] states that Kantishna claim owners "shall consent to such vesting in writing to the Secretary of Interior within said 90 day period" after enactment. The legislation does not define "consent" for purposes of ascertaining valid property transfer to the United States.[11] Nor does the legislation confer any administrative authority upon the government for construing valid consents.[12] Instead, the legislation authorizes an action for just

---

[7]    *E.g., Celotex, supra* at 322.

[8]    *E.g., Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 888 (1990).

[9]    *E.g., Anderson* v. *Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

[10]    The "Section 120" legislation in contained within the Department of Interior & Related Agencies Appropriations Act of 1998. *See* Pub. L. No. 105-83 § 120, 111 Stat. 1543,1564-65 (1997).

[11]    *See id.*

[12]    *Id.*

3

compensation to be determined according to the Declaration of Takings Act ("DTA").[13] With

this limited guidance, a question arises of law to apply in determining valid consents under

Section 120.

In *Northwest Explorations, Inc. v. United States,* a dispute arose as to whether valid

consent occurred under Section 120.[14] This Court commented "neither party provided sufficient

reasoning to support their construction of the statute."[15] As a default, the Court suggested the

federal common law of contracts controlled in ascertaining "consent."[16] Thus, the Court would

look to the principle of offer and acceptance in contract to determine whether a valid consent had

been effectuated for transfer of property under Section 120. However, the Court acknowledged

that its interpretation was not conclusive and allowed the parties to demonstrate what law should

control interpretation of the consent issue.[17]

Shearer surveys the following sources as authority for interpreting consent under Section

120: first, ANILCA's legislative history indicates that consent was a condition precedent to

exercise of eminent domain as an alternative to voluntary property acquisition; second, property

descriptions in federal condemnation must be specific although the condemnor has authority to

---

[13]     40 U.S.C. §§ 3114-15 (formerly codified at 40 U.S.C. § 258a, *et seq*).

[14]     *Northwest Explorations, Inc. v. United States,* Order Granting Motion to Amend
Pleadings and Extending Stay of Counts Two Through Four of Amended Complaint at 6-7, No.
A98-0086 CV (JKS) (D.Alaska, filed Dec. 23, 1998), copy attached as Exh. 2 to Motion of the
United States for Partial Summary Judgment (Docket 39).

[15]     *Northest Explorations, supra,* Order from Chambers (D.Alaska, filed Jan. 26,
1999), copy attached as Exh. 3 to Motion of United States for Summary Judgment.

[16]     *Northwest Explorations, supra* Note 14, Order at 7.

4

amend the pleadings, thereby resolving any ambiguity in property description; third, federal

condemnation generally looks to state law on property interests, and hence, the common law

sheds light on construing property descriptions in conveyancing; and fourth, the common law of

contracts looks to extrinsic evidence, including the intentions of the parties, where the meaning

of a contract is not plain and unambiguous.

Shearer applies these sources of authority to demonstrate the validity of his consent for

Parcels 2-21 identified in the First Amended Complaint.  Alternatively, Shearer applies these

sources of authority to dispute the government's contention that his consent was invalid.

### B.    Section 120 Consent Was Intended to Protect ANILCA In-Holders from Compulsory Property Acquisition.

The Section 120 legislation was drafted to address Kantishna mining claimants who were

not allowed to mine since 1985 and who were frustrated in obtaining just compensation from the

government.[18] The legislative history recognizes this problem and authorized a procedure for

voluntary property acquisition that effectuated a legislative taking.  In exchange, the consenting

property owners would have the opportunity to determine just compensation in a court

proceeding pursuant to the DTA:

---

[17]      *Northwest Explorations, supra*  Note 15, Order from Chambers.

[18]      *See* H. Conf. Rep. No. 105-337 at 76, 105th Cong., 1st Sess., *reprinted in,* 1997
U.S. Code, Cong. & Admin. News 2183; 143 Cong. Rec. at S11263 (daily ed. Oct. 28. 1997)
(Statement of Sen Murkowski: "Those Denali inholders who wished to sell their inholdings to
the Park Service have waited for just compensation for some time in some cases. . . .  I hope that
a nearly 15 year problem will finally be resolved"); *id.* at S11270 (Statement of Sen. Stevens:
"This provision is designed to bring an end to nearly 20 years of uncertainty surrounding the
future of these claims, and it will ensure that the owners of the claims receive just compensation
in return for their interests") .



> Amendment No. 67:  Amends language relating to Kantishna
> Mining Claims acquisition which was set out in the Senate bill. . . .
> In 1980, the area became part of the National Park System.  In
> 1985, the Park Service was enjoined from approving claim owners'
> operation plans until an Environmental Impact Statement (EIS)
> was completed.  The preferred alternative in the EIS was for the
> National Park Service to acquired the claims.  Under these
> circumstances, and subsequent delays and uncertainties, a large
> majority of claim owners believed that mining operation plans
> would not be approved.  This section is intended to provide both
> the claim owners and the National Park Service with an
> expeditious mechanism to resolve these claims.  While
> incorporating the procedures in the Declaration of Takings Act,
> this section includes an additional procedure provided under this
> section for the owner's ability to bring suit.

> The managers realize that there has been significant dispute as
> to whether there has been a taking of mining claims.  This section
> offers consenting claim owners the opportunity at least to obtain
> compensation as of 90 days from the day of enactment of this Act,
> while leaving the takings matter to the parties or the court system
> to resolve.[19]

The legislative history to Section 120 follows ANILCA's legislative history that in-

holders in "Conservation System Units" were to be protected against compulsory property

acquisition.[20]  Thus, the Conference Report to the Interior Appropriations bill that authorized

Section 120 states: "Congress does not authorize the National Park Service to use this section to

---

[19]    H.R. Rep. No. 105-56, *supra,* at 76-77.

[20]    *See, e.g.,* S. Rep. No. 96-413 at 303-04 (1980), *reprinted in* 1980 U.S. Code,
Cong. & Amin News 5070, 5247-48 (re: Section 1302 "Other landowners are subject to
condemnation but the Secretary is to make a good faith effort to find suitable Federal land for an
exchange prior to any condemnation proceeding. . . . [T]he Committtee has provided authority to
effect an exchange prior to final judgment rather than force the landowner to accept monetary
compensation for his land"); H. Rep. No. 96-97, Pt. 1 at 246 (1979) (re: Section 1101(f) "The
Committee expects that the Secretary will use his condemnation authority only as a last resort").



force unwilling property owners off of their patented and unpatented land."[21]  ANILCA

legislative history expresses a similar view that disfavored condemnation of in-holdings without

the property owners' consent.[22]

The Section 120 legislative history recognizes that Kantishna claim owners were

frustrated in obtaining just compensation from the Park Service.[23]  Because the legislation was

intended to provide an "expeditious mechanism" in resolving this problem, the owners'

intentions on disposition of their property should be emphasized vis-a-vis the federal

government.  By comparison, a cribbed or onerous interpretation of consent perpetrates the status

quo and defeats the congressional mandate.  Favorably construing Shearer's intentions on

consent therefore gives effect to the "expeditious mechanism" that Congress set forth in Section

120.

### C.    Property Descriptions Are Construed Consistent with the Condemnor's Intentions and Amendments for This Purpose Are Allowed.

Federal condemnation law, including condemnations under the DTA, requires that the

property subject of the action be sufficiently described.[24]  In theory an inadequate legal

description would void a condemnation action although there does not appear to be federal

---

[21]     H.R. Rep. No. 105-66, *supra* at 77.

[22]     *See supra* Note 20.

[23]     *See supra* Note 18.

[24]     *See* 40 U.S.C. § 3114(a)(2) (formerly codified at 40 U.S.C. § 258a(2)); *see also* 6 Nichols on Eminent Domain §§ 26A.03, .04 (2005).

precedent on point.[25]  However, problematic property descriptions in federal condemnation have been resolved through an imputed rule of interpretation that gives effect to the condemnor's intentions.[26]  Such intentions are construed from the terms of the condemnation and associated declaration, ancillary documents accompanying the action, and surrounding circumstances.[27]

From the condemnor's standpoint, any difficulties in ascertainment of property description can be remedied through amendment of the pleadings.[28]  However, proposed amendments may result in a greater or lesser take than the approved declaration of taking ("DT"), and hence, there is tension in this practice: where a lesser take is proposed, the United States cannot be divested of title already acquired pursuant to a consummated DT.[29]  Also, the condemnee is barred from asserting a greater taking without the United States' authorization; the

---

[25]    *See* 6 Nichols on Eminent Domain, *supra* § 26A.04, at 26A-74 & n.1; *cf. U.S. v. 39.20 Acres of Land,* 143 F.Supp. 623, 625 (D.N.D. 1955) (quoting C.J.S., Eminent Domain § 259; owners sought to nullify only supplementary part of property description; court rejected request because the description was as susceptible to definition as the circumstances would allow).

[26]    *See U.S. v. 76.208 Acres of Land,* 580 F.Supp. 1007, 1010 (E.D.Pa. 1983) (citing cases cited by United States).

[27]    *See id.*

[28]    Fed. R. Civ.Proc.71A(f) expressly allows amendment of the complaint in condemnation, and procedure in DTA proceedings are governed by Civil Rule 71A. *See also* 12 C. Wright, A. Miller & R. Marcus, *Federal Practice & Procedure: Civil 2d* § 3049 (1997).

[29]    *U.S. v. 16,572 Acres of Land,* 45 F.Supp. 23, 26-27 (S.D.Tex. 1942) (proposed amendment that would have eliminated mineral estate from prior declaration of taking prohibited because government lacked authority to divest itself of title). *Cf., e.g., Higginson v. U.S.,* 384 F.2d 504, 507 (6th Cir. 1967) (government no longer needed property after declaration consummated, however, it lacked authority to abandon property back to original property owners without congressional authorization).



owner's remedy lies in a separate inverse condemnation action.[30]  Courts have resolved this

tension by characterizing a problematic description as a mistake suitable for reformation, or an

accurate ascertainment of the intended description, rather than a deliberate alteration of the

original taking.[31]

Given that Section 120 allows either the property owner or the government to file the just

compensation action, and the just compensation action is to conducted pursuant to the DTA, then

the owner should be entitled to amend its pleadings.  The owner's amendment of the pleadings

should therefore include remedying any deficiency in the property description as allowed the

United States under the DTA.  Moreover, allowing the property owner to amend his pleadings in

a Section 120 action implements the legislative history that emphasizes the owner's consent and

expeditious resolution of the Kantishna problem.  With this construction of the statute, the

government's objections to the property description in Shearer's consent are cured by his First

Amended Complaint.  *See* Declaration of Paul Shearer ¶¶ 18-25, attached as Exh. A with this

opposition memorandum.

The United States contends that Shearer's property description is deficient under the

---

[30]    *E.g., Narramore v. U.S.,* 960 F.2d 1048, 1050 (Fed.Cir. 1992); *U.S. v. 38.60 Acres of Land,* 625 F.2d 196, 199-200 (8th Cir. 1980).

[31]    *See U.S. v. 101.88 Acres of Land,* 616 F.2d 762, 767-68 (5th Cir. 1980) ("the court is empowered to ascertain the accuracy with which the interests sought to be acquired are described"); *U.S. v. 21.54 Acres of Land,* 491 F.2d 301, 305-06 (4th Cir. 1973) ("whether the government has in fact accurately described the land in which it intends to take easements . . . . is analogous to a case in which the language of an instrument of conveyance is reformed to accurately reflect the true intentions of the parties"); *76.208 Acres of Land, supra* at 1009 ("amendments to a Declaration of Taking are permitted where the proposed amendment is to rectify a mistake in the original Declaration;"citing cases).

DTA.  *See* Points and Authorities in Support of Motion of the United States for Partial Summary Judgment at 7-10 ("U.S. Memo").  However, the government disregards the liberal practice of amending the pleadings under the DTA, and the motion fails to consider the hybrid nature of the Section 120 proceeding in this regard.  *See id.*  Taking the government's contention that Shearer has a "burden under Section 120 to describe to the Government the property to which he is consenting," *id.* at 8, it fails to consider that Shearer's burden may be met through an amended pleading.  *See id.*  Additionally, Shearer conferred with Charles Gilbert contemporaneous with preparing his proposed consent, showed a draft consent that reflects the terms finally used, and Gilbert never expressed objection to "all such interests" language that was not accompanied by a complete enumeration of specific properties.  *Id.* ¶ 16-17.

The government's challenge to Shearer's First Amended Complaint would be extremely unfair, impose financial hardship and essentially eliminate all properties from his Section 120 action with the exception of the Doherty claim.  Shearer Decl. ¶¶ 37-39.  Circa 1994, Shearer undertook a course of action that continued for several years to quiet title to several Kantishna mining claims.  *Id.* ¶¶ 13-14, 21.  Both before and after filing of this Section 120 action, Shearer consulted with the NPS regarding his course of action and the government did not object to Shearer's 1998 consent.  *Id.* ¶¶ 15-17.

Moreover, the government understood and encouraged Shearer to amend his Complaint in order to specify the properties on which he had consented after his state court quiet title litigation had been conclude.  *Id.* ¶¶ 22-23.  Under these circumstances, the principle of judicial estoppel prohibits the government from repudiating its prior course of action and dealing with

Shearer on clearing title to his Kantishna properties and amending his complaint to specifically identify Parcels 2-21 as part of his consented taking.[32]

### D.   The Common Law Allows Extrinsic Evidence to Determine Property Descriptions in Order that Conveyances Be Given Effect.

Federal condemnation is governed by federal law.  However, the courts will look to the law of the states to define property interests and rights subject of the proceeding where federal law lacks guidance.[33]  Local law will not govern interpretation of property interests in condemnation if this conflicts with federal objectives.[34]  The principle that federal condemnation law looks to the states for the meaning of property must be modified regarding mining claims.

Public land mining claims are created under the public land laws, and hence, the property rights in federal mining claims are governed by federal law.[35]  However, the General Mining

---

[32]   *See, e.g., Fredenberg v. Contra Costa County Dept. Health Services,* 172 F.3d 1176, 1178 (9th Cir. 1999) ("doctrine of judicial estoppel . . . precludes litigants from asserting inconsistent positions in different forums"); *Johnson v. Oregon Dept. of Human Resources,* 141 F.3d 1361, 1369 (9th Cir. 1998) ("if a claimant's particular representations are so inconsistent that they amount to an affront to the court, judicial estoppel may apply").

[33]   *E.g., United States ex. rel. Tennessee Valley Authority v. Powelson*, 319 U.S. 266, 279 (1943) ("Though the meaning of 'property' as used . . . in the Fifth Amendment is a federal question, it will normally obtain its content by reference to local law").

[34]   *See United States v. Little Lake Misere Land Co.,* 412 U.S. 580, 596 (1973) ("the congressional purpose can best be accomplished by application of settled state rules as to what constitutes `real property' . . . ; [this] approach would be acceptable only so long as it is plain, as it is here, that the state rules do not effect a discrimination against the Government, or patently run counter to the terms of [federal legislation]") (internal quotations & citations omitted).

[35]   *See, e.g., Wilbur v. U.S. ex rel Krushnic,* 280 U.S. 306, 116-17 (1930) (mining "claim is property in the fullest sense of that term; and may be sold, transferred, mortgaged, and inherited without infringing on any right or title of the United States"); *Shumway, supra* at 1099-

Law of 1872 delegated to the states and local mining districts authority for recordation of public land mining claims.[36]  This delegation of authority still exists with the proviso that state or local requirements shall not be inconsistent with the laws of the United States.[37]  The Federal Lands Policy & Management Act of 1976 enacted new requirements that recordations under the Mining Law of 1872 had to be additionally filed with the Bureau of Land Management for the claims to be maintained.[38]

Part of the common law of real property is conveyancing, including the requisites for a valid and enforceable conveyance of an interest in real property.  The common law of conveyancing requires property descriptions to be sufficiently certain to effectuate the transfer of designated real property.[39]  Property descriptions need not be determined from the four corners of the conveyance, and the modern law of conveyancing will allow extrinsic evidence to be introduced to resolve deficiencies in the property description.[40]  Alaska law is consistent with

---

1102 (surveying federal precedent on property rights in public land mining claims).

[36]     Act of May 10, 1872, c. 152, § 5, 17 Stat. 92, *codified at* 30 U.S.C. § 28 ("The miners of each mining district may make regulations not in conflict with the laws of the United States, or with the laws of the State or Territory in which the district is situated, governing the location, manner of recording, amount of work necessary to hold possession of a mining claim, subject to the following requirements: . . . .")

[37]     *Id.*

[38]     Pub. L. No. 94-579 § 314, 90 Stat. 2743, *codified at* 43 U.S.C. § 1744.  The FLPMA recording requirements pertained to the initial location notice and annual affidavits of labor.  *Id.*

[39]     *See* 14 Powell on Real Property § 81A.05 (2000); R. Natelson, Modern Law of Deeds to Real Property § 7.1 (1992); 2 M. Friedman, Contracts and Conveyances of Real Property § 7.6 (6th ed. 1998).

[40]     *See* 14 R. Powell, *supra* § 81A.05[1][iii] ("modern courts generally allow

12



this view:

> A valid deed must designate the land intended to be conveyed with reasonable certainty. However, "[t]he purpose of a deed description is not to identify the land, but to furnish the means of identification." Thus, a description is sufficient if it contains information permitting identification of the property to the exclusion of all others.

> Older cases suggest that where the terms of the grant or deed leave the identity of the property completely uncertain, the deed is void. The general rule, however, is that where possible, deeds will be made operative and the intentions of the parties given effect. A deed is not void for uncertainty of description if the quantity, identify, or boundaries of the property can be determined by reference to extrinsic evidence. Such evidence may include parole and subsequent conduct of the parties as well as other documents. There appear to be few restrictions on the use of extrinsic evidence in ambiguous or uncertain deed cases, although at least one court cautioned that "there may be sufficient information in the property description to base title substantially on written evidence and not principally on parole evidence."[41]

Among the extrinsic aids to determine a property description is examination of recorded

deeds that correspond to the grantor's terms of conveyance. Thus a conveyance need not

definitively identify the property subject of the grant if the property can be separately identified

---

extrinsic evidence to explain and "flesh out" a [property] description"); Natelson, *supra* § 7.1 at 150 ("in modern courts, instruments with incomplete land descriptions are sustained if there is reliable extrinsic evidence to supplement the description, even if the deed does not directly refer to that evidence"); 2 M. Friedman, *supra* § 7.6(h), at 1066-67 ("a deed will not be declared void for this reason [of vagueness] if it possible by any rule of construction, aided by extrinsic evidence, to identify the premises intended").

[41]     *Shilts v. Young,* 567 P.2d 769, 774 (Alaska 1977) (quoting *Matney v. Cedar Land Farms, Inc.,* 224 S.E.2d 162, 165 (Va. 1976), and *Tinney v. Lauve,* 280 So.2d 588, 591 (La. App. 1973); citing 6 Thompson on Real Property § 3021, at 441, 444-45 (1962 replacement) & cases)

by reference to recorded instruments.[42] Thus, property descriptions of the form "all of my land in X location" will suffice, and a conveyance will be enforceable as between the parties if resort to the recorder's office for X location identifies property titled in the grantor at the time of the conveyance.[43] In the law of conveyancing, such property descriptions are known as a "Mother Hubbard" clause.[44]

The government contends that Shearer's consent is invalid because specific properties are not identified with the exception of the Doherty Claim (Parcel 1 in the First amended Complaint). U.S. Memo at 8. According to the government, Shearer's language of consent "[a]ll such interests in mining claims in the Kantishna area of Denali National Park" is too vague. *See id.* at 10. Thus, the Park Service asserts that it could not identify any other mining claims aside from the Doherty Claim that were intended to be included in the scope of Shearer's consent. *Id.* (citing Gilbert Decl. ¶¶ 5-8). The government's proffer relies on the Park Service's own records as to title of Kantisha mining claims rather than recorder's office filings. *See* Gilbert Declaration ¶ 5, Exh. 1 to U.S. Memo.

---

[42]    *See* 2 M. Friedman, *supra* § 7.6(h), at 1067 & n.7 (citing authorities); Natelson, *supra* § 8.5, at 176 & n.12 (citing cases). *See also, e.g., Luthi v. Evans,* 576 P.2d 1064, 1066-1070 (Kan.1978); *Somont Oil Co. v. Nutter,* 743 P.2d 1016, 1022 (Mont. 1987); *Roeder Co. v. Burlington Northern, Inc.,* 855 P.2d 855, 858, 860 & n.10 (Wash. 1986).

[43]    *See id.*

[44]    *E.g.,* 2 M. Friedman, *supra* § 7.6(h), at 1067 n.7; *Luthi, supra* at 1067 ("a deed or other instrument in writing which is intended to convey an interest in real estate and which describes the property to be conveyed as 'all of the grantor's property in a certain county' is commonly referred to as a 'Mother Hubbard' instrument"); *Roeder, supra* at 860 & n.10 ("Catchall phrases (sometime referred to as 'Mother Hubbard' descriptions) purporting to convey all of a grantor's land in a given area have been repeatedly upheld").

Shearer disputes the Park Service's inability to identify Parcels 2-21 subject of his consent. Shearer Declaration ¶¶ 4-10, 40-47. Thus, a competent examination of recorded documents in the Fairbanks Recording District under Shearer's name will disclose ownership in Parcels 1-21. *Id.* ¶¶ 4, 6, 10, 41. Significantly, the Park Service does not aver that it examined the records in the Fairbanks Recording District to ascertain whether Shearer had an ownership interest in Parcels 1-21 on the effective date of taking (February 12, 1998). *See* Gilbert Decl. ¶¶ 5-8; Shearer Decl.¶ 42. Nor does the Park Service aver that it procured a title report, mineral title abstract or the services of the qualified professional to determine title to Parcels 1-21 on the effective date of taking. *See* Gilbert Decl. ¶¶ 5-8; Shearer Decl. ¶ 43. Instead, the Park Service relies on its own internally maintained records that show no correspondence with a conventional title plant or recorder's office filings. *See id.*

According to the common law of conveyancing, Shearer's Section 120 consent was in the nature of a "Mother Hubbard Clause." His description "all such interests in mining claims in the Kantishna area of Denali National Park" imparted constructive notice of mining claims responsive to his consent. *See* Shearer Decl. ¶¶ 4-6, 10. Shearer contends that any person could examine the records in the Fairbanks Recording District as of February 12, 1998, and find at least 29 documents in which he showed a record interest to Kantishna mining claims. *Id.* ¶¶ 4-6. The government's apparent failure to engage in a conventional title examination to ascertain ownership of Parcels 1-21 should therefore not operate as legal excuse to defeat Shearer's consent under Section 120. *See id.* ¶ 10. Moreover, because the government has failed to undertake the proper inquiry for ascertaining property interests responsive to Shearer's consent, *see id.* ¶¶ 4-6, 10, 41-43, it cannot claim to have personal knowledge disputing whether Shearer's

consent could be validated by records in the Fairbanks Recording District.

Shearer emphasizes that he has proffered more than 300 title documents to substantiate his ownership in Parcels 1-21 subject of this action. Shearer Declaration ¶¶ 4-7. Shearer tendered these documents in response to the government's discovery requests on matters of title and ownership to the properties on which he is purporting to have made a valid consent. *Id.* ¶¶ 9, 44. The government has offered no opinion or analysis of these title documents on the issue of ownership of Parcels 1-21. See Gilbert Decl. ¶¶ 5-8. Instead, the government shields itself from inquiry notice and verification of Shearer's "Mother Hubbard" clause by restricting its attention to its own title records. *See id.* Moreover, Shearer provided the Park Service with constructive notice and records of his ownership interests in Kantishna mining claims prior to, and contemporaneous with tender of his consent. Shearer Decl. ¶¶ 26-27.

### E. The Common Law of Contracts Allows Extrinsic Evidence to Determine Intentions of the Parties Due to Ambiguity.

In *Northwest Explorations*, the Court examined the issue of consent under Section 120 pursuant to the federal common law of contracts. *See supra* at 3. The Court viewed a Section 120 consent as a contract entered pursuant to federal law with the United States as a party. Specifically, "[t]he document by which Northwest purportedly gave consent has all the essentials of (sic) required of an acceptance of an offer to sell an interest in land."[45] The Court furthermore stated that Alaska law could be examined regarding relevant contract principles since federal

---

[45]     *Northwest Explorations, supra* Note 5, Order at 7 n.2.

common law may look to the law of the states where not in conflict with federal law.[46]

The modern trend in federal common law is to admit extrinsic evidence as an aid in contract interpretation even in the absence of ambiguity.[47]   Alaska common law follows this principle in regard to both contract formation and interpretation of valid contracts.[48]  Thus extrinsic evidence is considered among other factors in ascertaining the intention of the parties entering into a contract:

> In interpreting a contract, the objective is to give effect to the reasonable expectations of the parties. . . . To ascertain the reasonable expectation of the parties, we look to the language of the disputed agreement, the language and conduct of the parties, the objects sought to be accomplished and the surrounding circumstances at the time the contract was negotiated. . . .
>
> The process of weighing the evidence of the circumstances surrounding the partnership agreement and resolving disputes pertaining to the parties' intent is for the trier of fact.[49]

On issues of intent and consideration of extrinsic evidence, the Alaska common law of contracts parallels the common law of conveyancing.  Thus any issues regarding Shearer's intent

---

[46]     *Id.* at 8 n.3 (citing authorities).

[47]     *E.g., Chickaloon--Moose Creek Native Ass'n v. Norton*, 360 F.3d 972, 983 (9th Cir. 2004) (appeal from D. Alaska, Hon. James K. Singleton, Jr.) (citing *O'Neill v. United States*, 50 F.3d 677, 684 (9th Cir. 1995).

[48]     *See Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1281 (Alaska 1985) (where writings are ambiguous on issue of mutual assent and contract formation, extrinsic evidence may be considered to ascertain intentions of the parties); *Mullen v. Christiansen,* 642 P.2d. 1345, 1349 & n.4 (Alaska 1982) (principles of contract formation and interpretation applied to sustain verdict on existence of partnership); *Kupka v. Morey*, 541 P.2d 740, 748 (Alaska 1975) (extrinsic evidence may be considered in determining whether writing reflects the intention of the parties notwithstanding  an integration clause);

[49]     *Mullen, supra* at 1349 n.4.

17

under Section 120 may be resolved by considering extrinsic evidence beyond his written consent. Though the government recognizes that Shearer's intent is material, it apparently requires his intent to be manifested exclusively in the written consent.[50] Such an interpretation is contradicted by both the modern law of conveyancing and contract because it ignores consideration of any extrinsic evidence beyond the written consent.

If there were any doubts about the properties subject of Shearer's 1998 consent, then his listing of Parcels 1-21 in the First Amended Complaint should dispel such uncertainty. Shearer Decl. ¶¶ 23-24. In this regard, Shearer contends the government knowingly followed his efforts at quieting title to his Kantishna mining claims and expected an amended complaint to articulate the properties subject of his consent. *Id.* ¶¶ 20-24, 38. Aside from pleadings filed in this action, the government purported ignorance of Shearer's intent disregards his tender of some 300 title documents as extrinsic evidence of intent even though it solicited his production of records that would shed light on ownership of properties subject of his consent. *Id.* ¶¶ 4-5, 8-9, 44. Furthermore, the government's examination of its own title records as extrinsic evidence of Shearer's intent is unreasonable because it failed to engage in any conventional title examination through impartial sources, *id.* ¶¶ 6, 41-43, and it disregarded various documents and communications which Shearer had proffered to the Park Service over the years and prior to commencement of this action. *Id.* ¶¶ 26-27.

## II. SHEARER AGREES TO DISMISS HIS SECTION

---

[50]    "It is plaintiff Shearer's consent that defines the property taken, and he alone has knowledge as to the property he purports to own and to which he is consenting to a taking. Here, however, the consent submitted by Mr. Shearer fails to identify any properties to which he is consenting other than a portion of the Doherty lode mining claim." Memo at 8.

## 120 ACTION AS TO PARCELS 4, 5 AND 6.

Shearer included Parcels 4, 5 and 6 in his First Amended Complaint for just compensation because his title examination and quiet title actions over the years showed these parcels as having been represented as validly located mining claims under the public land laws when they were conveyed to Shearer's predecessors.. At the time of filing his First Amended Complaint, Shearer had attempted to obtain information on these mining claims from BLM but had not yet obtained a confirmation as to the legal status of these mining claims to be able to conclude if any of the mining claims had been patented. Shearer has received legal council on the recordation and assessment work requirements of FLPMA § 314 and the legal consequences for failure to comply with these provisions. Shearer understands that mining claimants who fail to file copies of their recorded certificates of location for unpatented mining claims with the BLM by December 30, 1979, will be deemed to have abandoned the public land entry and any rights thereunder.

The Declarations of Diane Wohlwend and Evalyn Garis state that no record of location certificate is on file with the BLM for the mining claims included in Parcels 4, 5, and 6. *See* U.S. Memo, Exhs. 4, 5. The Declaration of Diane Wohlwend further states that there are no records of Parcels 4, 5, and 6 being patented mining claims based on a search of records maintained by the Mining Claim Acquisition Program within the National Park Service. Shearer has not been able to review or confirm this evidence since the United States has not responded to his discovery requests on these Parcels 4, 5, and 6. Shearer has also not been able to search online for these patented claims on the BLM Management Land and Mineral Records LR2000 System online since that public reporting system is unavailable due to court order. Therefore

19

Shearer has no evidence to the contrary at this time. Shearer therefore concedes that Parcels 4, 5 and 6 are not enforceable property interests for purposes of a Section 120 action in just compensation. Shearer will agree to dismissal of his First Amended Complaint as to Parcels 4, 5 and 6.

### III. SHEARER WILL STIPULATE TO DISMISSAL OF PARCEL 2 IF THE UNITED STATES RECOGNIZES THAT TITLE WAS NEVER TRANSFERRED PURSUANT TO SECTION 120.

The government contends that Shearer's consent as to Parcel 2 is invalid. U.S. Memo at 12-13. Parcel 2 is the Galena lode claim although Shearer's consent refers only to a royalty interest in minerals production from that claim. First Amended Complaint ¶ 42. The government reasons that Shearer was not the owner of this royalty interest on the date of taking, and in any event, the Section 120 consent must refer to the entire property and not a fractional ownership interest therein. U.S. Memo at 13-14. Shearer disagrees on the issue of vested ownership rights but acknowledges that even if he were vested with ownership on the date of legislative taking that a consent as to a royalty interest only would not suffice for purposes of the Section 120 legislation.

Shearer Decl. ¶ 48.

Shearer is agreeable to dismissing his consent on Parcel 2 as set forth in the First Amended Complaint if the United States will stipulate that any consents executed as to this property interest are null and void, and therefore, any documents the Park Service caused to be recorded regarding the consent(s) are also null and void. Shearer Decl. ¶ 51. Shearer demands such stipulation as a condition of dismissal because the United States may not both deny a legislative taking as to this property interest while clouding the title of the royalty interest with

recordation of a "Transfer of Property Ownership" document in the Fairbanks Recording

District.  *Id.*. ¶¶ 50-51.  Thus, the legal consequence of any stipulated dismissal of Parcel 2 with

prejudice from this action is that title to Galena claim royalty interest remains in private

ownership.

## IV. GENUINE ISSUES OF MATERIAL FACT PRECLUDE
## THE ENTRY OF PARTIAL SUMMARY JUDGMENT.

The United States' Motion for Partial Summary judgment fails to argue that no evidence

exists to support the essential elements of Shearer's case as the non moving party.  Additionally,

the United States motion fails to state that absence of a genuine issue of material fact that would

preclude entry of summary judgment.  These averments are fundamental prerequisites to entry of

summary judgment pursuant to Civil Rule 56, and the United States' motion must therefore be

denied due to non-compliance with the standards for entry of summary judgment.  Shearer posits

these objections with regard to Part I of the Argument in the Points and Authorities in Support of

the United States Motion and not Parts II and III.

The fallacy in the United States' Motion for Partial Summary Judgment is its assertion

that the issue of Shearer's consent under Section 120 presents a pure question of law even though

the United States proffers factual materials in support of its motion for partial summary

judgment.  Once the United States proffers evidence in support of its motion for summary

judgment, then it acknowledges that factual elements are incorporated in the question of law

presented, and it has the burden of demonstrating no genuine issue as to such factual elements.  It

has failed to do so.

Assuming arguendo the United States met its initial burden of going forward as to the

21

argument in Part I of memorandum of Points and Authorities, Shearer raises genuine issues of

material fact regarding extrinsic evidence as to his consent to the Section 120 taking in Parts I.D

and I.E of this Opposition.  In support of Shearer's proffer of evidence creating genuine issues of

material fact are his declaration and the numerous exhibits attached thereto.  The existence of a

genuine issue of material fact therefore precludes entry of partial summary judgment in favor of

the United States on the issue of consent as set forth in part I of the United States' memorandum

of Points and Authorities.

The Shearer Declaration and supporting exhibits demonstrate substantial evidence of his

intentions regarding consent; specifically, that his "all such interests" language of consent

operates as a "Mother Hubbard" property description which can be verified through examination

of real property records in the Fairbanks Recording District resulting in identification of Parcels

2-21 being the subject of his consent; that the Park Service was on constructive if not actual

notice of Shearer's intention to incorporate several properties in his consent through a course of

dialogue and tender of documents as early as 1994 and continuing through filing of this action in

2003; and that Shearer's proffer of title documents in response to the United States discovery

requests discloses Parcels 2-21 being the properties subject of his consent.

Shearer separately contends that his argument in Parts I.A through I.C. present pure

questions of law, or law supported by material facts which cannot be disputed if the principles of

law are well taken.  Thus, Shearer contends that the legislative history to ANILCA and Section

120, along with an analysis of federal condemnation law with regarding property descriptions

and amendment to the pleadings to clarify or rectify problematic property descriptions, allows

him to amend his pleadings in this Section 120 action to clarify the property interests subject of



his consent, and the amendment operates to cure any objection regarding inadequacy of property description in his original consent. For these reasons, Shearer is cross moving for partial summary judgment as to the arguments presented in Parts I.A through I.C. of this Opposition Memorandum.

**CONCLUSION**

For all of the above reasons, then plaintiff Paul Shearer respectfully requests that the Court deny the Motion of the United States for Partial Summary Judgment.

DATED at Lake Oswego Oregon, this 16 day of December, 2005.

Plaintiff
Paul G. Shearer
1532 Meadows Drive
Lake Oswego, Oregon 97034