RECEIVED

JAN 0 9 2006

CLERK U.S. DISTRICT COURT
ANCHORAGE, ALASKA

Paul G. Shearer
1532 Meadows Drive
Lake Oswego, Oregon 97034
(503) 697-4378

## UNITED STATES DISTRICT COURT

## DISTRICT OF ALASKA

| | |
|---|---|
| PAUL G. SHEARER, | ) |
| | ) Case No. A03-0263 CV (JKS) |
| Plaintiff, | ) (Consolidated) |
| | ) |
| vs. | ) |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| GALE A. NORTON, Secretary of the | ) |
| Interior, DEPARTMENT OF INTERIOR, | ) **REPLY MEMORANDUM IN SUPPORT** |
| and, NATIONAL PARK SERVICE, | ) **OF PLAINTIFF'S CROSS MOTION** |
| | ) **FOR PARTIAL SUMMARY** |
| Defendants. | ) **JUDGMENT RE: § 120 CONSENT** |
| | ) |

### INTRODUCTION

The United States filed a Motion for Partial Summary Judgment, along with a

memorandum of Points and Authorities ("U.S. Memo") in support thereof (Docket 39). The

government contends Shearer did not validly consent to Parcels 2-21 as identified in the First

Amended Complaint pursuant to provisions of Section 120, Pub. L. No. 105-83, 111 Stat. 1564-

66, copy attached as Exh. A. The government reasons that Shearer's consent is deficient as a

matter of law, partial summary judgment is therefore appropriate, and requests dismissal of

Parcels 2-21 from this action.

1

Shearer filed an Opposition to United States Motion for Summary Judgment (Docket 65) and simultaneously filed a Cross Motion for Partial Summary Re: Section 120 Consent (Docket 64). Shearer's memorandum of points and authorities (Oppos.) supported both his opposition to the United States' Motion for Partial Summary Judgment along with Shearer's Cross Motion thereto. Shearer's cross motion contends that he made a valid consent under the Section 120 legislation as to Parcels 2-21. Shearer's memorandum of points and authorities contends the government's interpretation of the consent requirement is incorrect as a matter of law and separately disputes the absence of any genuine issues of material fact supporting the entry of partial summary judgment in its favor.

The United States has now filed a Reply in Support of Motion of the United States for Partial Summary Judgment and Opposition to Plaintiff's Cross Motion ("Reply") (Docket 72). The Reply serves as a consolidated memorandum in support of the United States Motion for Partial Summary Judgment along with an opposition to Shearer's Cross Motion for Partial Summary Judgment. Shearer has no objection to the consolidated memorandum filing.

This memorandum replies to the United States' consolidated memorandum filing in regard to its Opposition to Plaintiff's Cross Motion. Shearer's Cross Motion seeks entry of partial summary judgment in regard to Parts I.A through C of the argument set forth in his memorandum. Parts I.D and E of the argument in Shearer's memorandum advance questions of material fact in opposition to the government's motion, and hence, Shearer did not cross move for summary judgment on these arguments.

The United States' latest memorandum raises for the first time legal arguments sounding in sovereign immunity and legislative taking that were not presented in its opening

2

memorandum. *Cf.* Docket 72 at 6-7, 9-11, 20, *with* Docket 39 at 7-10. To the extent these arguments are styled as opposition to Shearer's cross motion for summary judgment, then this reply responds to same. However, to the extent the government's new arguments are advanced as reply in support of its own motion, Shearer cries foul because the government may not raise for the first time legal argument on a reply filing before the court.

As an expedient remedy, Shearer incorporate in this memorandum a rebuttal to the United States arguments regarding sovereign immunity and legislative taking as these pertain to Parts I.D. and E of Shearer's Opposition argument. Otherwise, Shearer would have the right to file a new cross motion for partial summary judgment arguing that Section 120 functions as a sufficient waiver of sovereign immunity to incorporate state property law rules, and Section 120 is not a "pure" legislative taking but instead a hybrid form of action.

### REPLY ARGUMENT

### I. THE GOVERNMENT'S SOVEREIGN IMMUNITY HAS BEEN SUFFICIENTLY WAIVED TO AUTHORIZE SHEARER'S CONSENT TO PARCELS 2-21.

The government contends for the first time that sovereign immunity precludes Shearer from consenting to any property taking under Section 120 which is not specified according to its interpretation. *See* Reply 6-7, 9-11, 20. In effect, the government argues that its sovereign immunity was only waived to authorize consent to an enumerated property description; otherwise, the government has not consented to suit under Section 120 for more general property descriptions such as a "Mother Hubbard" clause included in Shearer's consent. *See id.* The government's general principles of sovereign immunity do not support its conclusion for the following reasons:

3

The United States acknowledges that Section 120 operates as a waiver of sovereign immunity subject to the mining claimant's consent to a taking. Reply at 6. Shearer disagrees that Congress imposed strict conditions for effectuating consent that limit its waiver of sovereign immunity. *See id.* at 6-7. Rather, Section 120 and its legislative history are altogether silent regarding any conditions for expression of consent.[1] The government understood the absence of any congressional guidance on the matter in *Northwest Exploration*, and this Court agreed "The United States is correct that the statute provides no specific form for the giving of consent to the legislative taking."[2] The government's inference of strict conditions for consent is therefore speculative and contradicts its prior representation to the Court on the matter.

While waivers of sovereign immunity must be strictly construed, *see* Reply at 7 (citing cases), courts are also "careful not to assume the authority to narrow the waiver that Congress intended," or "construe the waiver unduly restrictively."[3] This principle has been applied to waivers of sovereign immunity that incorporate a limitations period for filing suit. In that context, the Supreme Court has recognized an equitable tolling principle although not expressly

---

[1]     *See* 111 Stat. 1564-66; H. Conf. Rep. No. 105-337 at 76-77, 105th Cong., 1st Sess., *reprinted in,* 1997 U.S. Code, Cong. & Admin. News 2183.

[2]     *Northwest Explorations, Inc. v. United States,* Order Granting Motion to Amend Pleadings and Extending Stay of Counts Two Through Four of Amended Complaint at 7 n.2, No. A98-0086 CV (JKS) (D.Alaska, filed Dec. 23, 1998), copy attached as Exh. 2 to Motion of the United States for Partial Summary Judgment (Docket 39).

[3]     *Bowen v. City of New York,* 476 U.S. 467, 479 (1986) (quoting *United States v. Kubrick,* 444 U.S. 111, 118 (1979), and *Block v. North Dakota,* 461 U.S. 273, 287 (1983); *accord, e.g., Irwin v. Dept. Veterans Affairs,* 498 U.S. 89, 94 (1990); *Broughton Lumber Co. v. Yeutter*, 939 F.2d 1547, 1552 (Fed.Cir. 1991).

4

stated in the waiver of sovereign immunity.[4]  The Court reasoned as follows:

> Once Congress has made such a waiver, we think that making the
> rule of equitable tolling applicable to suits against the Government,
> in the same way that it is applicable to private suits, amounts to
> little, if any, broadening of the congressional waiver. Such a
> principle is likely to be a realistic assessment of legislative intent
> as well as  practically useful principle of interpretation.  We
> therefore hold that the same rebuttable presumption of equitable
> tolling applicable to suits against private defendants should also
> apply to suits against the United States.[5]

Following *Irwin,* Section 120 consents should be interpreted in the same way that

consents are interpreted in private suits.  In a similar manner, federal condemnation law looks to

the state law of property in ascertaining property interests subject of a taking.[6]  Such recognition

of state law has been allowed where the interpretation does not frustrate federal objectives.

According to *Irwin,* the approach taken in federal condemnation law suggests a limited waiver of

sovereign immunity because "[s]uch a principle is likely to be a realistic principle of legislative

intent as well as a practically useful principle of interpretation."  Therefore, Shearer's proposed

application of federal condemnation law to recognition of the state law of conveyancing does not

---

[4]     *Bowen, supra; Irwin, supra.*

[5]     *Irwin, supra* at 95-96.

[6]     *See* Oppos. at 13 & n.33; *see also infra* part VI at 15-19.  For purposes of this
reply memorandum, the term "federal condemnation law" refers to precedent addressing
condemnation with declaration of taking rather than "straight" condemnation actions.

5

violate the waiver of sovereign immunity in Section 120. *See infra* part VI.

Section 120 authorizes either "the United States or a claim owner . . . [to] initiate

proceedings [to] determin[e] . . . just compensation pursuant to the Declaration of Takings Act."

111 Stat. 1565. The government's waiver of sovereign immunity in Section 120, and any

principle of strict construction thereof, should therefore be interpreted in conjunction with the

Declaration of Takings Act ("DTA").[7] In this regard, the legislative history specifically states

that a consenting mining claimant may "incorporat[e] the procedures and jurisprudence in the

Declaration of Taking Act."[8] While the government obviously retains its role as condemnor in

Section 120, it would be incongruous to this express waiver of sovereign immunity to deny

Shearer the procedure and practice under the DTA, including application of Civil Rule 71A.

The government's waiver of sovereign immunity pursuant to the DTA is not unlimited.

Thus, the condemnee may not assert counterclaims against the United States because the

government is deemed to have waived its sovereign immunity only with regard to the property

subject of the taking. *See* Oppos. at 8-9. Stated differently, government retains discretion as to

the scope of the taking and whether to enlarge or contract the property subject of condemnation.[9]

Due to the hybrid nature of the Section 120 action, *see infra* at 11-12, this limitation on waiver

of sovereign immunity is distinguishable because the property owner's consent is a predicate to

---

[7]       *See, e.g., United States v. Mottaz,* 476 U.S. 834, 841 (1986) (terms of waiver of
sovereign immunity define the extent of a court's jurisdiction); *accord, Broughton, supra* at 1550
(Columbia River Gorge Scenic Area Act authorized government to initiate condemnation but did
not waive immunity for inverse condemnation).

[8]       *See supra* Note 1,  H. Conf. Rep.105-337, at 76.

[9]       *E.g., Narramore v. United States,* 960 F.2d 1048, 1050 (quoting *Berman v.
Parker,* 348, 26, 32 (1954).

the taking.  Moreover, the mining claimant determines the scope of the taking in the first instance

due to its requisite consent.[10]

      This analysis of sovereign immunity and interpretation of waivers of sovereign immunity

to the Section 120 legislation supports the terms of Shearer's consent and answers the

government's reply to the contrary.  An elaboration is provided below in regard to the

government's specific reply arguments.

## II.  THE LEGISLATIVE HISTORY TO SECTION 120 PERMITS SHEARER'S MANIFESTATION OF CONSENT.

      Shearer interprets the legislative history of ANILCA and Section 120 for the propositions

that the Secretary of Interior should utilize condemnation as a last resort, that non consenting

holders' rights should be observed, that realization of just compensation for Kantishna mining

claimants had become a problem after the 1985 court injunction, that Section 120 created an

"expeditious mechanism" for resolution of such problem, and a threshold step towards such

resolution was manifestation of consent to a legislative taking.  *See* Oppos. at 5-7. Accordingly,

Shearer interprets the legislative history to support the consenting mining claimants' intentions

on disposition of their property vis-a-vis the federal government.  *Id.* at 7.

      The government disagrees with Shearer's interpretation of Section 120's legislative

history.  Reply at 18-20. Specifically, the government disagrees that the legislative history

---

[10]     To say that a Kantishna mining claimant determines the scope of the taking under Section 120 is still subject to procedural, property status and geographic limitations, and hence, the government's waiver of sovereign immunity is still circumscribed.  Thus, Section 120 authorizes consent for patented and unpatented public land mining claims only in the area known as the Kantishna Mining District; the consent must be manifested in writing; and the consent must be executed and tendered to the United States within ninety days of enactment of Section 120.

supports consents of the form Shearer submitted in February 1998. *See id.* In support, the

government offers equivocal reliance on *Northwest Exploration* which is not persuasive for the

reasons stated below in Part V.

Shearer's answer is that the Section 120 legislative history clearly incorporates the

"procedures and jurisprudence of the Declaration of Taking Act," *see supra* at 6 & n.8; federal

condemnation law allows problematic property descriptions to be interpreted according to the

intentions of the condemnor, including amendment to the pleadings, Oppos. at 8 & nn.26-28; and

federal condemnation law looks to the law of the state in ascertaining property interests subject

of condemnation. *Id.* at 11. Therefore, Shearer's interpretation of the Section 120 legislative

history for the proposition that the intentions of consenting property owners should be

emphasized is consistent with congressional incorporation of DTA practice and procedure.

### III. SHEARER'S CONSENT SATISFIES THE REQUIREMENTS OF FEDERAL CONDEMNATION LAW AND THE DTA.

The United States contends Shearer's consent is ineffective because it does not meet the

DTA requirements for a property description. Reply at 20-21. The DTA provision merely states

that a declaration of taking must contain "a description of the lands sufficient for the

identification thereof." 40 U.S.C. § 3114 (a)(2). The United States provides no gloss on this

statutory language other than to contend that Shearer should have the same burden under Section

120 to describe to the Government the property to which he is consenting as the United States

has in describing property taken when it is the condemnor. U.S. Memo at 8; Reply at 21. The

government furthermore contends that the claim owner's consent defines the mining claims

taken, and the claim owner alone has the knowledge as to the property he or she wishes to

8

consent to a taking. *Id.*

Shearer answers by stating the "all my interests" language in his consent can be construed through examination of the records of the Fairbanks Recording District on the effective date of consent (February 12, 1998). Oppos. at 15 (citing Shearer Decl. ¶¶ 4, 6, 10, 40). In support of this response, Shearer has cited federal condemnation law for the proposition that problematic property descriptions have been resolved through an imputed rule of interpretation that gives effect to the condemnor's intentions. Oppos. at 8. According to the precedent, such intentions are construed from the terms of the condemnation and associated declaration, ancillary documents accompanying the action, and surrounding circumstances. *Id.*

The Reply disregards this authority. Instead, the government complains that it could not determine the properties subject of Shearer's 1998 consent. *See* U.S. Memo at 10 (citing Gilbert Decl. ¶¶ 5, 8). The government attempts to lend credence to its complaint because Shearer falsely cloaks himself as condemnor, Reply at 8-10, and the government refuses to consider condemnation law principles that might shed light on problematic property descriptions because these violate its interpretation of sovereign immunity. *See id.* The government's objection amounts to hypocrisy because it would impose upon Shearer the DTA requirement for property description as if he were the condemnor, but it would deny Shearer any of the procedural or remedial devices for resolving problematic property descriptions because he is not the condemnor. In essence, the government wants the law both ways.[11]   As stated above, Section

---

[11]    Section 120 includes a proviso to incorporation of the DTA "except where inconsistent with this section." The government has not drawn on the Section 120 proviso in urging that Shearer may not utilize DTA jurisprudence to effectuate his consent. Such an interpretation  would contradict the legislative history to Section 120 which expressly authorizes

120 authorizes a hybrid form of legislative taking in which participating Kantishna mining

claimants have rights to just compensation pursuant to the "procedure and jurisprudence of the

Declaration of Takings Act." Thus, Section 120 waives sovereign immunity at least for purposes

of allowing consenting mining claimants to utilize the DTA. Shearer has identified a principle

of DTA jurisprudence regarding interpretation of property descriptions according to the

condemnor's intentions. If Shearer is to assume the burden of a sufficient property description

under the DTA, then he should enjoy the benefit of corresponding DTA jurisprudence that

resolves problematic property descriptions according to the condemnor's intentions. As this

Court has repeatedly observed "what's good for the goose is sauce for the gander." The

government's objection otherwise is illogical and functions as a transparent attempt to defeat

Shearer's enrollment of Parcels 2-21 under Section 120.

## IV.  SHEARER'S CONSENT IS EFFECTIVE THROUGH AMENDMENT OF THE PLEADINGS ALLOWED UNDER RULE 71A.

Shearer additionally contends that any difficulties in ascertainment of the property subject

of his consent can be remedied through amendment of the pleadings. Oppos. at 8-10. Thus, any

deficiencies in property description ion in Shearer's consent are remedies through the First

Amended Complaint which enumerates identifies Parcels 2-21. *Id.* The United States objects for

the same reason that it objects to Shearer's reliance on principles of condemnation law regarding

interpretation of property descriptions according to the condemnor's intentions, i.e. Shearer is not

the condemnor in a Section 120 action. Reply at 8-10. For the reasons stated above, the

government's objection amounts to a contradictory application of the DTA to Shearer when it

the consenting property owner to incorporate the procedure and jurisprudence of the DTA in

sees fit, and Section 120 expressly authorizes consenting property owners to utilize the "procedure and jurisprudence of the Declaration of Takings Act."

Shearer need not have the status of condemnor to invoke application of Civil Rule 71A, including amendment of the pleadings as necessary. In this regard, Shearer contends that Rule 71A applies to Section 120 actions because these are a form of condemnation action with declaration of taking,[12] and the Supreme Court has determined that Rule 71A was promulgated as a uniform rule of procedure to be utilized in all condemnation actions.[13] Since Congress intended the procedure and jurisprudence of the DTA would apply to Section 120 actions, the procedure and practice under Civil Rule 71A should also apply to Section 120 actions.

The government additionally objects that amendments to the pleadings for purposes of property description are not permissible in a Section 120 action because this sounds in legislative taking. Reply at 9-10. The government cites no authority supporting its analysis other than precedent illustrative of the three methods of taking. *See id.* Shearer submits the government's analysis of the law is mistaken.

Section 120 does not authorize a "pure" legislative taking, but instead a contingent legislative taking wherein consent, and consequently property description, turns on participating mining claimants. In a "pure" legislative taking, Congress commits the condemnation itself

---

bringing the action in just compensation,

[12]    *See* Plaintiff's Opposition to United States' Motion to Strike Jury Demand and Memorandum in Support of Cross Motion FRCP 39(b) at 7 & nn. 16-18 (Docket 67).

[13]    *See Kirby Forest Industries, Inc. v. United States,* 467 U.S. 1, 5 & nn 3-4 (1984). *See also* 12 C. Wright, A. Miller & R. Marcus, *Fed. Prac. & Proc.: Civil 2d* §§ 3041 (discussing history of Rule 71A), 3054 (discussing Rule 71A practice under DTA).

11

rather than delegating the action to the Executive Branch through enabling authority.[14]  Also, Congress itself describes the property subject of the taking in the legislation which vests title in the affected property in the United States.[15]  On these attributes of a "pure" legislative taking, Shearer agrees with the United States.  *See* Reply at 10.  However, Congress did not unconditionally take property in Section 120 but instead delegated the matter to consenting Kantishna mining claimants.[16]

Moreover, the incorporation of DTA procedure and jurisprudence into Section 120 means that amendments to the pleadings authorized under the DTA further distinguish Section 120 from a pure legislative taking.  Thus, while federal condemnation law prohibits expansion or contraction to the scope of the take after title has vested in the United States, *see* Oppos. at 8-9 & nn. 29-30, amendments to the pleadings for purposes of reformation or correcting mistaken descriptions are allowed.  *Id.* at 9 & n.31. The government insinuates an understanding of this practice through its statement "[a]ny later judicial pleadings do not *define* the property taken, but at most *describe* the property taken for which compensation is sought (emphasis added)."  Reply

---

[14]       *See Kirby, supra* at 5; *Narramore, supra* at 1050.  *Cf. Drakes Bay Land Co. v. United States,* 424 F. 574, 584 (Ct.Cl. 1970) (taking of land within Pt. Reyes National Seashore was by "acquisition otherwise" authority of the Secretary of Interior; court commented "this is a hybrid situation, not a pure legislative taking as in the Redwoods Act").

[15]       *See, e. g.,* 16 U.S.C. § 79c(b)(1) (authorizing legislative taking of property for inclusion in Redwood National Park according to boundaries identified in referenced maps); 16 U.S.C. § 410ff-1(e)(1) (authorizing legislative taking of property for inclusion in Channel Islands National Park "on the eastern end of Santa Cruz Island which is known as the Gherini Ranch"); 16 U.S.C. § 429b(b)(2)(A) (authorizing legislative taking of property "Addition" to Manaassas National Battlefield Park described in § 429b(b)(1)).

[16]       The reasons for such delegation are apparent in ANILCA's legislative history along with that of Section 120.  *See* Oppos. at 5-7.

12

at 10-11.

The government's interpretation of the terms "define" and "describe" do not necessarily bar Shearer's amended pleading in this Section 120 action for purposes of articulating the property subject of his February 1998 consent. Thus, Shearer adequately "defined" his consent consistent with common law conveyancing practice, Oppos. at 15, and his consent has been further "described" in the First Amended Complaint. *Id.* at 9-10. Shearer has not violated the condemnation law prohibition on expansion or contraction of the take (assuming he is cloaked with status of condemnor, with which the government disagrees) because the property subject of his February 1998 consent has not changed. Rather, the extrinsic evidence which supported an independent determination of Parcels 2-21 on February 12, 1998, Oppos. at 15 (citing Shearer Decl. ¶¶ 4-10, 41-47), is now verified through the enumeration of Parcels 2-21 in the First Amended Complaint.

## V. *NORTHWEST EXPLORATION* IS RELEVANT TO INTERPRETATION OF SHEARER'S CONSENT.

Shearer has drawn on *Northwest Exploration* for determining the law to apply on valid consents under Section 120. Oppos. at 3-5, 16-17. According to this Court's prior rulings in *Northwest Exploration*, the common law of contracts may be applied to determine the validity of consent under Section 120.[17] The government acknowledges *Northwest Exploration* considered law-to-apply but contends the Court's discussion is neither relevant nor applicable to this case. Reply at 17. The government distinguishes *Northwest Exploration* for two reasons: first, the parties had actually negotiated purchase prior to filing of the Section 120 action. And second, the

---

[17]    *See Northwest Exploration,* Note 2 *supra,* Order at 6-7.

13

consent issue addressed in *Northwest Exploration* did not concern property description. *Id.*

The government's attempted distinction of *Northwest Exploration* is not persuasive. The fact that the parties had engaged in purchase negotiations in *Northwest Exploration*, while relevant, does not appear to control this Court's reliance on federal common law for construing consent.[18] The Orders entered in *Northwest Exploration* are silent on the existence or status of negotiations preceding consent. Instead, the Court discusses federal common law regarding executory real estate transactions generally and looks to contract law principles in ascertaining whether Northwest and the United States manifested a binding property transfer:

> By adopting the United States' position the Court would approve a standardless process whereby the government would determine what is and is not valid consent without any oversight. It appears to the Court that the United States is essentially seeking specific performance on the agreement it alleges it reached with Northwest
>
> ———————
>
> 2.     . . . . The United States is correct that the statute "provides no specific form for the giving of consent to the legislative taking["]. However, contract law principles provide standards by which to gauge the validity of Northwest's consent. The document by which Northwest purportedly gave consent has all the essentials of (sic) required of an acceptance of an offer to sell an interest in land, and the United States argues that Northwest should be bound to perform on the purported agreement. In the absence of other governing standards, the Court concludes that the adequacy of Northwest's consent should be interpreted based on contract terms.[19]

———————

[18]     *Id.*

[19]     *Id.* at 7 & n.2 (quoting footnote). The government's distinction grounded on executory contract in *Northwest Exploration* would be more persuasive if the dispute were purely contractual, i.e akin to a voluntary property acquisition. However, once the property owner purported to consent under Section 120 and commenced the action in just compensation, the prior relationship between the parties merged into the congressional scheme for legislative taking along with an evaluation of law to apply in ascertaining the existence and validity of consent therein. Shearer submits this interpretation is consistent with the Court's Orders in *Northwest Exploration*.

14

While the consent issue in *Northwest Exploration* did not concern the adequacy of property description, this factual distinction is immaterial to the Court's reliance on the common law of contracts generally. Thus, either the federal common law or Alaskan law on contracts where not in conflict with the federal common law, should be useful in applying principles of interpretation where the existence of a contract is in dispute. *See* Oppos. at 16-18. For this reason, Shearer draws on the well established rule that extrinsic evidence of the parties' intentions may be considered in ascertaining whether a contract has been formed, including whether a property description is sufficient.

The government also equivocates on application of *Northwest Exploration* because it considers that case is helpful in interpreting the legislative history to Section 120. *See* Reply at 19. Thus the government relies on this Court's Order that "not just any form of consent constitutes valid consent under § 120." Yet the government fails to disclose that it was advocating a standardless process for determining consent in *Northwest Exploration* and that this Court agreed with its interpretation that Section 120 "provides no specific form for the giving of consent to the legislative taking." *See supra* at 14 (quoting *Northwest* Order).

## VI.  SHEARER'S CONSENT MAY BE ASCERTAINED ACCORDING TO THE COMMON LAW OF CONTRACTS OR CONVEYANCING.

Shearer contends that ascertainment of property descriptions in Section 120 consents can be interpreted according to the common law of conveyancing. Oppos. at 11-15. Shearer relies on federal condemnation law for the proposition that courts will look to the law of the states to define property interests and rights subject of the proceeding where federal law lacks guidance. *Id.* at 11. Since Section 120 incorporates the procedures and jurisprudence of the DTA, the

15

sufficiency of property descriptions in federal condemnation may look to the common law of conveyancing where not inconsistent with federal objectives.

The government objects that Section 120 consent is not an ordinary conveyance document, Reply at 20; the requisite consent under Section 120 must comply with principles of sovereign immunity and jurisdictional waivers thereto, *id.* at 6-7; Shearer has failed to show that common law has been applied to define property taken by a legislative taking, *id.* at 20; and an ascertainment of the properties subject of Shearer's consent is inconsistent with the DTA requirement for sufficient property description. *Id.* at 20-21. Shearer disagrees for the reasons already set forth above and expanded upon here:

A Section 120 consent operates in like manner to an "ordinary conveyance document" because it contains basic attributes of a conveyance:[20] the consent pertains to patented and unpatented mining claims, 111 Stat. 1564, which are real property interests recognized under

---

[20]   BLACK'S LAW DICTIONARY at 402 (4th ed. 1968) defines "conveyance" as follows:

> In real property law. In the strict legal sense, a transfer of legal title to land. In the popular sense, and as generally used by lawyers, it denotes any transfer of title, legal or equitable. . . . The transfer of title from one person or class of persons to another . . . . An instrument in writing under seal (anciently termed an assurance) by which some estate or interest in lands is transferred from one person to another; such as a deed, mortgage, etc. (citations omitted).

*See also* AS 34.15.010 ("Manner of Creating Conveyances"); AS 34.15.030 ("Form of Warranty Deed"); AS 34.15.040 ("Form of Quitclaim Deed"). Moreover, to the extent that a Section 120 consent is analogized to an executory contract for sale of real estate, the requirement of legal descriptions in executory real estate contracts is less stringent than that for actual instruments of conveyance. *See generally* M. Friedman, CONTRACTS AND CONVEYANCES OF REAL PROPERTY §§ 1.3 n.90, 7.6(a) at 1040 (6th ed. 1998).

16

public land law and the law of real property generally;[21] the consent must be manifested in writing, 111 Stat. 1564; the title on which the consent is grounded is established according to "recordations under the mining laws and regulations, *id*;" and the consent effectuates the transfer of "all right, title and interest" to the United States if performed by February 12, 1998. *Id.* The only significant attribute of a conveyance absent from Section 120 is acknowledgment of the grantor's signature in a format suitable for recordation and in compliance with the Statute of Frauds.[22]

The common law as well as state law of real property has been recognized in federal condemnation.[23] Specifically, federal courts have utilized principles of mistake and reformation in interpreting problematic property descriptions in condemnation.[24] The principles of mistake

---

[21]    *E.g., Bradford v. Morrison,* 212 U.S. 389, 394 (1909) (valid public land mining claims constitute "property in the fullest sense of the word"); *accord, United States v. Shumway,* 199 F.3d 1093, 1100 (9thCir. 1999) (J. Kleinfeld: quoting *Morrison*).

[22]    *See* AS 09.25.010(b) (statute of frauds: requires conveyances of interests in lands to be in writing and executed by grantor); AS 34.15.010(a) (requires conveyances under Alaska law to be executed by grantor and acknowledged by notary public)

[23]    *See* Oppos. at 11 & n.33 (citing *United States ex rel Tennessee Valley Authority v. Powelson,* 319 U.S. 266, 279 (1943) (meaning of property subject of federal condemnation may be interpreted according to state law where no federal law applies); *see also Board of County Supervisors of Prince William County v. United States,* 48 F.3d 520, 526-27 (Fed. Cir. 1995) (local government's compensable property interest in dedicated streets interpreted according to common law and Virginia statutory law); *United States v. Certain Property Located in Borough Manhattan,* 344 F.2d 142, 144 (2d Cir. 1965) (compensation for trade fixtures in condemned buildings interpreted according to New York rather than federal law).

[24]    *See, e.g., United States v. 21.54 Acres of Land,* 491 F.2d 301, 305 (4th Cir. 1973) (condemnation with declaration of taking; issue of accuracy of property description "is analogous to a case in which the language of an instrument of conveyance is reformed to accurately reflect the true intentions of the parties"); *United States v. 76.208 Acres of Land,* 580 F.Supp. 1007, 1009 (E.D.Pa. 1983) ("amendments to a Declaration of Taking are permitted where the proposed amendment is to rectify a mistake in the original Declaration," citing cases).

and reformation are part of the common law as set forth in the *Restatement (Second) of Contracts.* [25] The government appears to be laboring under a mistaken perception that in federal condemnation with declaration of taking, the congressional waiver of sovereign immunity precludes consideration of state or common law property rules:

> The government insists it is under no obligation to pay for trade fixtures at all. Its first proposition is that in condemnation it need pay only for what it has "taken," regardless of what other losses the taking may cause. Harsh as the proposition sounds and whatever qualifications it may require . . . we accept it for purposes of this case. . . . Next, says the Government, the question of what the United States takes when it files a declaration of taking of real property is a question as to which the federal courts *may* make an independent determination, free from any requirement, *Erie R.R. Co. v. Tompkins,* 304 U.S. 64 (1938), to follow state law. We fully agree. . . . Where we break off with the Government is at its third proposition--that the interest in nationwide uniformity in federal condemnation makes it imperative for federal courts to *use* this freedom to ignore state property law in determining what the United States takes when it takes "real estate."[26]

Moreover, *Irwin* indicates that waivers of sovereign immunity be interpreted consistent with principles of equity where "[s]uch a principle is likely to be a realistic principle of legislative intent as well as  practically useful principle of interpretation."[27] Interpreting waivers of sovereign immunity according to equitable principles in private litigation suggests a common law approach to interpretation of consents and property descriptions in Section 120 contrary to

---

[25]    *See Restatement (Second) of Contracts* §§ 151-58 (mistake), § 155 (reformation) 1981).

[26]    *Borough of Manhattan, supra* at 144 (citations omitted; emphasis in original).

[27]    *Irwin, supra* at 95-96.

the government's assertion otherwise.[28] *Irwin*'s guidance is consistent with the well reasoned

opinion in *Borough of Manhattan*--when there is no substantial evidence of congressional intent

that federal interests must control in adjudicating property rules and rights in condemnation, then

state law principles and common law rules may be consulted.

Shearer contends that his Section 120 consent was in the nature of a "Mother Hubbard"

clause according to the common law of conveyancing. Shearer further contends that any person

could examine the records in the Fairbanks Recording District as of February 12, 1998, and

ascertain record interests in Parcels 2-21 identified in the First Amended Complaint. The

government's only response to this proffer is to reiterate the DTA requirement for a property

description and then state it should not be burdened ascertaining the nature of Shearer's title.

However, for the reasons stated above, Shearer has demonstrated that federal

condemnation law will recognize state law property rules, and pursuant to the common law of

conveyancing, the government could ascertain the properties subject of Shearer's consent.

Reduced to its fundament, the government's objection is that it is too lazy or inept to search

beyond its own records and failed to search the Alaska State Recording office title records.

Additionally, Shearer has contended that the common law of conveyancing allows extrinsic

evidence of intent to resolve problematic property descriptions. The government refuses to

consider such extrinsic evidence based on its mistaken perception that federal condemnation law

bars such practice. This fallacious excuse should not suffice to defeat Shearer's consent under

---

[28]     Shearer need not show that the common law or state law of real property is
recognized in legislative takings because Section 120 is not a pure legislative taking but rather a
hybrid action incorporating the DTA. *See supra*  . Shearer need only show that federal DTA
practice has incorporated such principles of law.

Section 120 as a matter of law.

## VII. EQUITABLE ESTOPPEL LIES AGAINST THE GOVERNMENT FOR ITS AFFIRMATIVE MISCONDUCT REGARDING SHEARER'S CONSENT.

Shearer contends that dismissal of Parcels 2-21 in his First Amended Complaint should be barred on principles of either judicial or equitable estoppel against the United States. Oppos. at 10-11. The government disagrees that Shearer has proven an estoppel against the United States. Reply at 11-17. The government proffers a Second Declaration of Charles Gilbert in support of its response that Shearer has failed to prove the traditional elements of estoppel let alone affirmative misconduct against the United States.

Shearer disagrees, or at least contends genuine issues of material fact exist on whether an estoppel should lie. In this regard, Shearer emphasizes that this Court entered orders staying his discovery requests of the United States pertaining to consent issues. *See* Dockets 57, 69. Thus, Shearer has been denied discovery of government documents that may shed light on its knowledge of title as to Parcels 2-21, its understanding of Shearer's intentions on consent, along with other material facts relevant to proof of estoppel. *See* Shearer Decl. ¶¶ 29-36, attached as Exh A to Oppos.; Shearer 2d Decl. ¶¶ 3, 9, 17. Shearer's proffer on estoppel follows:

### A.    The Party to Be Estopped Must Know the Facts.

Commencing in 1994, Shearer placed the National Park Service on notice through various communications and documentary submissions that he asserted ownership interests in several Kantishna mining claims. Shearer Decl. ¶¶ 7, 26; Shearer 2d Decl. ¶¶ 3-7. Gilbert disputes that a 1994 letter put the government on notice of any properties aside from the

20

Keystone, Pennsylvania and Pittsburgh ("KPP") mining claims which it subsequently acquired from persons other than Shearer. *See* Gilbert Second Decl. ¶¶ 7-9; Reply at 14.

However, Gilbert's Second Declaration fails to disclose that the deeds which Shearer tendered to the Park Service in 1994 evidenced ownership interest in several mining claims aside from the KPP properties. Shearer 2d Decl. ¶¶ 3-7. That the Park Service was placed on actual notice of these additional properties is tacitly admitted in Gilbert's Second Declaration because he acknowledges that in July 2003 Shearer claimed title to other properties and sited a 1937 option agreement that enumerated the same sets of properties identified in Shearer's 1994 deeds. *See id.* ¶¶ 11-12; *cf.* Gilbert 2d Decl. ¶¶ 7-9.

When the Section 120 legislation was enacted, Shearer communicated with the NPS shortly before the deadline for submitting consent regarding his intentions and provided a draft form of consent document with the "all my interests" language in lieu of enumerating particular properties. Shearer Decl. ¶ 16; Shearer 2d Decl. ¶ 8. The NPS did not express objection. Shearer Decl. ¶ 17. The Park Service disputes Shearer's version of events. *See* Gilbert 2d Decl. ¶ 5; Reply at 14. The Park Service avers that its files do not show a document corresponding to Shearer's alleged draft Consent. *Id.* ¶ 6.

In rebuttal, Shearer submits that he has been stayed from conducting document discovery of the Park Service's records on the matter and should therefore have an opportunity to verify the government's self serving assertion that discoverable evidence does not exist. Shearer 2d Decl. ¶ 9. Moreover, Shearer understands the Park Service's practice is to purge property acquisition files, and hence whatever documentation may have existed in February 1998 may no longer exist now. *Id*

21

Additional evidence of the government's actual notice of Shearer's ownership of Parcels 2-21 and his intended Section 120 consent regarding same includes the following: Between 1994 and 1998, Shearer recalls having at least one meeting with Park Service personnel wherein he displayed a chart similar to Exhibit 20 attached with his Declaration that displayed title chains for several properties and the record instruments on which his claim of title was derived.   Shearer 2d Decl. ¶ 5b   Also, the government understood Shearer to have ownership interests in mining claims aside from the Doherty claim (i.e. the Keystone, Pennsylvania and Pittsburgh claims) based upon its own title records because it saw fit to request quitclaim conveyances of his record interest to clear title in the government's favor.  *Id.* ¶ 10.

As of July 2003, the United States basically admits that Shearer's 1998 consent affected several properties aside from the Doherty claim.  At that time, Gilbert recounts a telephone conversation between Shearer and a Park Service colleague, Ms. Diane Wohlwend.  Gilbert 2d Decl. ¶¶ 11-12.  The context of the telephone conversation was Shearer's interest in settlement of his Section 120 consent on several properties aside from the Doherty, and the government wanted to know what these properties were.  *Id.*  Shearer explained that several property interests which he owned were portions of mining claims included and enumerated in a 1937 option agreement, and that his section 120 consent encompassed these several properties.  *Id.*

Gilbert's current Declaration expresses surprise and astonishment regarding Shearer's ownership of the additional properties in July 2003.  *Id.* However, Shearer considers Gilbert's statement to be incredulous because the earlier 1994 and 1995 deeds listed many of the same mining claims enumerated in the 1931 option agreement with which Gilbert was supposedly familiar.  Shearer 2d Decl. ¶ 12.  Significantly, Gilbert did not convey his surprise or

22

astonishment to Shearer at the time, nor did Gilbert indicate that Shearer's 1998 consent was deficient because it did not identify the additional properties on which he was seeking just compensation. *Id.* ¶ 13.

**B.    The Party Asserting Estoppel Must Intend that His Conduct Is Acted Upon by the Adverse Party.**

Shearer continued to communicate with the Park Service in the period after the Section 120 consent deadline and through the 2003 time period before filing the complaint in this action in November 2003. Shearer 2d Decl. ¶¶ 18-19. During and after that time period, Shearer undertook substantial effort and expense to clear title to the several parcels in which his title was disputed. *Id.* Shearer conferred with the Park Service about his efforts because he did not want to commit himself if the Park Service would not accept consent for the properties in question. *Id.* The Park Service never expressed objection. *Id.* Gilbert's Second Declaration is silent on Shearer's assertions in this regard.

Shearer's quiet title efforts continued after commencement of this action. Shearer Decl. ¶¶ 18-24. Shearer sought a stay of this litigation, *id.* ¶ 20, and the government agreed, fully understanding that the purpose of Shearer's stay was to effectuate settlement of his state quiet title litigation. *Id.* ¶¶ 21-22. Moreover, paragraph 28 of the initial Complaint specifically plead that Shearer asserted ownership of mining claims aside from the Doherty and announced his intentions to clear title to such additional properties, followed by an anticipated amendment to his pleading. *Id.* ¶ 20. Numerous joint status reports were filed with this Court explaining Shearer's efforts and his expectation of eventually filing an amended complaint that would identify the properties subject of his consent. *Id.* ¶¶ 23-24; Shearer 2d Decl. ¶ 22. Shearer

23

represents that government counsel actually encouraged him in this course of action. *Id.*

The government offers no declaration disputing Shearer's assertions regarding his communications with the government after commencement of this action, the reasons for staying the litigation, the government's understanding that Shearer was committing effort and expense to clear title to several properties subject of his Section 120 action, and that the government encouraged him in this course of action with the expectation that Shearer would eventually amend his complaint. Shearer's assertions in this regard must be concerned well taken and not disputed for summary judgment purposes.

The Reply instead offers a legal argument that Shearer had a duty to tender an effective consent on February 12, 1998, and any agreement for amending the complaint in this action could not change the terms of the consent required in 1998. Reply at 15. This argument begs the question of whether Shearer's consent was legally effective in the form submitted. More importantly, the argument disregards the equities of Shearer's inducing the government to agree to his proposed course of action after 1998, the government knowing that Shearer was trying to clear title to the several parcels beyond Doherty, that Shearer's intentions would culminate in seeking just compensation for additional properties under Section 120, and yet failing to disclose to Shearer that it considered his 1998 consent to be legally deficient. Shearer Decl. ¶¶ 18-24; Shearer 2d Decl. ¶¶ 22, 24. According to the Ninth Circuit, such pattern of conduct constitutes possible estoppel.[29]

---

[29] *See Bolt v. United States,* 944 F.2d 603, 609 (9th Cir. 1991) ("we will assume without deciding that an estoppel claim is at least possible where the government knows that a claim is invalid but nonetheless permits the holder and other parties to plan further activities on the forfeited claim").

The Reply insinuates that the government agreed to Shearer's proposed course of action after filing of the Complaint because Shearer had expressed an interest in settlement and the government needed to know the additional properties to be included in an amended complaint for settlement purposes. *See* Reply at 15.  Shearer disputes the government's explanation regarding settlement because its consistent response to his settlement inquiries was that it had no duty to engage in settlement and settlement discussion was premature.  Shearer 2d Decl. ¶¶ 20-21.

The Reply also states that its agreement with Shearer to amend his complaint did not constitute an agreement that Shearer's consent included other properties beside the Doherty. Reply at 15.  No Declaration is proffered in support of these unsworn statements, and therefore, the government's explanation does not qualify as competent evidence under Civil Rule 56 standards.  Assuming alternatively the government's objection in the Reply asserts a legal defense, the government should be judicially estopped from changing its position in the litigation to Shearer's detriment for the same reasons that equitable estoppel is proven.

## C.    The Party Asserting Estoppel Must Be Ignorant of the True Facts.

Shearer contends that his February 1998 consent is effective as to Parcels 2-21 and that the government never informed him otherwise until it filed its Motion for Partial Summary Judgment on September 30, 2005, in this case.  Shearer Decl. ¶¶ 17, 25; Shearer 2d Decl. ¶¶ 13, 23.  The Declarations proffered by the United States nowhere state the Park Service imparted notice to Shearer that it contested the validity of his consent prior to the filing of the Motion for Partial Summary Judgment.  *See* Gilbert Decl; Gilbert 2d Decl.

Gilbert's Second Declaration indicates that the government was aware of Shearer's intended consent on several properties aside from the Doherty claim as of July 2003, Gilbert 2d

25

Decl. ¶¶ 11-12. While Gilbert expresses surprise and astonishment on the matter at the time, his declaration is silent about conveying his concern to Shearer. *See id.*; Shearer 2d Decl. ¶ 13-14. Therefore, from at least July 2003 forward, Shearer was ignorant of the government's intentions to contest validity of Shearer's Consent as to all parcels aside from the Doherty claim.

### D.      The Party Asserting Estoppel Must Reasonably Rely to Its Detriment on the Conduct of the Adverse Party.

Shearer has contended that he has spent considerable time and expense over several years quieting title to his ownership interest in several mining claims, that he explained his intentions and objectives to both Park Service personnel before the filing of this action and after the filing of this action with government attorneys, that his purpose for quieting title to the several properties was to advance his objective in obtaining just compensation for all the consented properties in which he quieted title, and that when his title curative objectives were completed he would amend the complaint in this action to include the additional properties beyond the Doherty claim. See the discussion in part VI.B supra.

Shearer further contends that he reasonably relied on the government's responses to his inquiries about quieting title and his intentions of incorporating the consented properties in his Section 120 claim for just compensation, and that his reliance was to his detriment in terms of substantial effort and expense incurred between 1993 and May of 2005. *See* Shearer Decl. ¶¶ 37-39; Shearer 2d Decl. ¶¶ 19, 24. The government has not offered any declarations that dispute Shearer's objectives and reasonable reliance. However, the Reply apparently disputes Shearer's reasonable reliance as a matter of law because he knew what his property interests were in 1998 and chose not to list these in his Consent due to title problems. *See* Reply at 7.

26

Shearer disagrees that his utilization of the "all my interests" language in his consent defeats his reasonable reliance as a matter of law because the common law of conveyancing recognizes "Mother Hubbard" clauses as an effective property description. Oppos. at 12-15. The Reply is silent on this legal issue, and hence, Shearer's legal argument should be well taken for purposes of summary judgment. In any event, the government's objection does not address Shearer's reasonable reliance during his subsequent course of dealing with the Park Service between 1998 and 2003, and thereafter with government lawyers between 2003 and 2005.

### E.    Affirmative Misconduct Must Be Shown To Prove Estoppel Against the United States.

According to the Ninth Circuit's standards, affirmative misconduct is not evidenced by negligent conduct. Rather affirmative misconduct must rise to "a deliberate lie . . . or pattern of false promises"[30] or "an affirmative misrepresentation or an affirmative concealment of a material fact."[31] Shearer submits that his course of dealing with the government over a period of years demonstrates an affirmative concealment of a material fact. The critical proof lies in the government's understanding that Shearer intended to claim just compensation on several properties aside from the Doherty claim, the government stood by while Shearer spent time and expense to clear title to such properties, when asked the government did not express disapproval or objection to Shearer's course of action and intentions, and yet the government never disclosed that it disputed the validity of Shearer's consent. *See supra* Parts VII.A through D.

---

[30]    *Mukherjee v. INS,* 793 F.2d 1006, 1009 (9th Cir. 1986)

[31]    *Bolt supra* (quoting *Watkins v. United States Army*, 875 F.2d 699, 707-08 (9th Cir. 1989 (en banc)).

## CONCLUSION

For all of the above reasons, then, plaintiff Paul Shearer respectfully requests that the

Court grant his Cross Motion for Partial Summary Judgment Re: Section 120 Consent.

DATED this 8th day of January, 2006, At Oswego, Oregon.

_____

Plaintiff
Paul G. Shearer
1532 Meadows Drive
Lake Oswego, Oregon 97034

CERTIFICATE OF SERVICE

I certify that on _1/8/2006_ 2005 a copy of the above documents was served by placing said copies in a postage prepaid envelope, addressed to that person at the place and address stated below, and by depositing said envelope and contents in the _US POSTAL_ mail at _PORTLAND_, Oregon.

_____
Paul G. Shearer

Addressee(s):

EXPRESS MAIL
US District Court
Clerk of Court
222 W. 7th Ave #4
Anchorage, AK  99513-7564
907-677-6100

Paul Harrison (copy)
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 561 – Ben Franklin Station
Washington, D.C.  20044
Email: paul.harrison@usdoj.gov
202-305-0299
202-514-8865  FAX

Dean K. Dunsmore (copy)
U.S. Department of Justice
Environment & Natural Resources Division
801 B Street, Suite 504
Anchorage, AK  99501-3657
Email: dean.dunsmore@usdoj.gov
907-271-5452
907-271-5827  FAX

1

PUBLIC LAW 105–83—NOV. 14, 1997          111 STAT. 1543

Public Law 105–83
105th Congress

An Act

Making appropriations for the Department of the Interior and related agencies
for the fiscal year ending September 30, 1998, and for other purposes.

Nov. 14, 1997
[H.R. 2107]

*Be it enacted by the Senate and House of Representatives of
the United States of America in Congress assembled,* That the
following sums are appropriated, out of any money in the Treasury
not otherwise appropriated, for the fiscal year ending September
30, 1998, and for other purposes, namely:

Department of
the Interior and
Related Agencies
Appropriations
Act, 1998.

TITLE I—DEPARTMENT OF THE INTERIOR

BUREAU OF LAND MANAGEMENT

MANAGEMENT OF LANDS AND RESOURCES

For expenses necessary for protection, use, improvement, development, disposal, cadastral surveying, classification, acquisition of
easements and other interests in lands, and performance of other
functions, including maintenance of facilities, as authorized by law,
in the management of lands and their resources under the jurisdiction of the Bureau of Land Management, including the general
administration of the Bureau, and assessment of mineral potential
of public lands pursuant to Public Law 96–487 (16 U.S.C. 3150(a)),
$583,270,000, to remain available until expended, of which
$2,043,000 shall be available for assessment of the mineral potential
of public lands in Alaska pursuant to section 1010 of Public Law
96–487 (16 U.S.C. 3150); and of which $3,000,000 shall be derived
from the special receipt account established by the Land and Water
Conservation Act of 1965, as amended (16 U.S.C. 460l–6a(i)); and
of which $1,500,000 shall be available in fiscal year 1998 subject
to a match by at least an equal amount by the National Fish
and Wildlife Foundation, to such Foundation for challenge cost
share projects supporting fish and wildlife conservation affecting
Bureau lands; in addition, $27,650,000 for Mining Law Administration program operations, to remain available until expended, to
be reduced by amounts collected by the Bureau and credited to
this appropriation from annual mining claim fees so as to result
in a final appropriation estimated at not more than $583,270,000;
and in addition, not to exceed $5,000,000, to remain available
until expended, from annual mining claim fees; which shall be
credited to this account for the costs of administering the mining
claim fee program, and $2,000,000 from communication site rental
fees established by the Bureau for the cost of administering communication site activities: *Provided,* That appropriations herein made

59–139 97 (83)

Exhibit __A__ page _1_ of _4_

to reflect any fluctuation occurring during the previous twelve (12) months in the Consumer Price Index, as determined by the Secretary of Labor".

SEC. 118. Any funds made available in this Act or any other Act for tribal priority allocations (hereafter in this section "TPA") in excess of the funds expended for TPA in fiscal year 1997 (adjusted for fixed costs, internal transfers pursuant to other law, and proposed increases to formula-driven programs not included in tribes' TPA base) shall only be available for distribution—

(1) to each tribe to the extent necessary to provide that tribe the minimum level of funding recommended by the Joint-Tribal/BIA/DOI Task Force on Reorganization of the Bureau of Indian Affairs Report of 1994 (hereafter "the 1994 Report") not to exceed $160,000 per tribe; and

(2) to the extent funds remain, such funds will be allocated according to the recommendations of a task force comprised of 2 designated Federal officials and 2 tribal representatives from each BIA area. These representatives shall be selected by the Secretary after considering a list of names of tribal leaders nominated and elected by the tribes in each area. The list of nominees shall be provided to the Secretary by October 31, 1997. If the tribes in an area fail to submit a list of nominees to the Secretary by October 31, 1997, the Secretary shall select representatives after consulting with the BIA. In determining the allocation of remaining funds, the Task Force shall consider the recommendations and principles contained in the 1994 Report. If the Task Force cannot agree on a distribution by January 31, 1998, the Secretary shall distribute the remaining funds based on the recommendations of a majority of Task Force members no later than February 28, 1998. If a majority recommendation cannot be reached, the Secretary in exercising his discretion shall distribute the remaining funds considering the recommendations of the Task Force members.

SEC. 119. Section 116 of the Omnibus Appropriations Act for Fiscal Year 1997 (Public Law 104-208; 110 Stat. 3009-201) is amended—

(1) by striking "Miners Hospital Grant" each place it appears and inserting in lieu thereof "Miners Hospital Grants";

(2) by striking "(February 20, 1929, 45 Stat. 1252)" each place it appears and inserting in lieu thereof "(July 16, 1894, 28 Stat. 110 and February 20, 1929, 45 Stat. 1252)"; and

(3) by striking "(July 26, 1894, 28 Stat. 110)" each place it appears and inserting in lieu thereof "(July 16, 1894, 28 Stat. 110)".

Claims.
Mines and
mining.

SEC. 120. Notwithstanding any other provision of law, 90 days after enactment of this section there is hereby vested in the United States all right, title and interest in and to, and the right of immediate possession of, all patented mining claims and valid unpatented mining claims (including any unpatented claim whose validity is in dispute, so long as such validity is later established in accordance with applicable agency procedures) in the area known as the Kantishna Mining District within Denali National Park and Preserve, for which all current owners (or the bankruptcy trustee as provided hereafter) of each such claim (for unpatented claims, ownership as identified in recordations under the mining laws and regulations) consent to such vesting in writing to the

PUBLIC LAW 105–83—NOV. 14, 1997       111 STAT. 1565

Secretary of the Interior within said 90-day period: *Provided,* That in the case of a mining claim in the Kantishna Mining District that is involved in a bankruptcy proceeding, where the bankruptcy trustee is a holder of an interest in such mining claim, such consent may only be provided and will be deemed timely for purposes of this section if the trustee applies within said 90-day period to the bankruptcy court or any other appropriate court for authority to sell the entire mining claim and to consent to the vesting of title to such claim in the United States pursuant to this section, and that in such event title in the entire mining claim shall vest in the United States 10 days after entry of an unstayed, final order or judgment approving the trustee's application: *Provided further,* That the United States shall pay just compensation to the aforesaid owners of any valid claims to which title has vested in the United States pursuant to this section, determined as of the date of taking: *Provided further,* That payment shall be in the amount of a negotiated settlement of the value of such claim or the valuation of such claim awarded by judgment, and such payment, including any deposits in the registry of the court, shall be made solely from the permanent judgment appropriation established pursuant to section 1304 of title 31, United States Code, and shall include accrued interest on the amount of the agreed settlement value or the final judgment from the date of taking to the date of payment, calculated in accordance with section 258a of title 40, United States Code: *Provided further,* That the United States or a claim owner or bankruptcy trustee may initiate proceedings after said 90-day period, but no later than six years after the date of enactment of this section, seeking a determination of just compensation in the District Court for the District of Alaska pursuant to the Declaration of Taking Act, sections 258a–e of title 40, United States Code (except where inconsistent with this section), and joining all owners of the claim: *Provided further,* That when any such suit is instituted by the United States or the owner or bankruptcy trustee, the United States shall deposit as soon as possible in the registry of the court the estimated just compensation, in accordance with the procedures generally described in section 258a of title 40, United States Code, not otherwise inconsistent with this section: *Provided further,* That in establishing any estimate for deposit in the court registry (other than an estimate based on an agency approved appraisal made prior to the date of enactment of this Act) the Secretary of the Interior shall permit the claim owner to present information to the Secretary on the value of the claim, including potential mineral value, and the Secretary shall consider such information and permit the claim owner to have a reasonable and sufficient opportunity to comment on such estimate: *Provided further,* That the estimated just compensation deposited in the court registry shall be paid forthwith to the aforesaid owners upon application to the court: *Provided further,* That any payment from the court registry to the aforesaid owners shall be deducted from any negotiated settlement or award by judgment: *Provided further,* That the United States may not request the court to withhold any payment from the court registry for environmental remediation with respect to such claim: *Provided further,* That the Secretary shall not allow any unauthorized use of claims acquired pursuant to this section after the date title vests in the United States pursuant to this section, and the Secretary shall permit the orderly termination of all operations on

Exhibit __A__ page __3__ of __4__

the lands and the removal of equipment, facilities, and personal property by claim owners or bankruptcy trustee (as appropriate).

SEC. 121. Section 1034 of Public Law 104–333 (110 Stat. 4093, 4240) is amended by striking "at any time within 12 months of enactment of this Act" and inserting in lieu thereof "on or before October 1, 1998" and by inserting at the end of the section the following new sentence: "If such litigation is commenced, at the court trial, any party may introduce any relevant evidence bearing on the interpretation of the 1976 agreement.".

SEC. 122. (a) KODIAK LAND VALUATION.—Notwithstanding the Refuge Revenue Sharing Act (16 U.S.C. 715s) or any regulations implementing such Act, the fair market value for the initial computation of the payment to Kodiak Island Borough pursuant to such Act shall be based on the purchase price of the parcels acquired from Akhiok-Kaguyak, Incorporated, Koniag, Incorporated, and the Old Harbor Native Corporation for addition to the Kodiak National Wildlife Refuge.

(b) REAPPRAISALS.—The fair market value of the parcels described in subsection (a) shall be reappraised by the Alaska Region of the United States Fish and Wildlife Service under the Refuge Revenue Sharing Act (16 U.S.C. 715s). Any such reappraisals shall be made in accordance with such Act and any other applicable law and regulation, and shall be effective for any payments made in fiscal year 1999.

(c) EFFECTIVE DATE.—The fair market value computation required under subsection (a) shall be effective as of the date of the acquisition of the parcels described is such subsection.

SEC. 123. ASSESSMENT OF FEES. (a) COMMISSION FUNDING.—Section 18(a) of the Indian Gaming Regulatory Act (25 U.S.C. 2717(a)) is amended—

(1) in paragraph (1), by striking "class II gaming activity" and inserting "gaming operation that conducts a class II or class III gaming activity"; and

(2) in paragraph (2)—

(A) in subparagraph (A)(i), by striking "no less than 0.5 percent nor" and inserting "no";

(B) in subparagraph (B), by striking "$1,500,000" and inserting "$8,000,000"; and

(C) nothing in subsection (a) of this section shall apply to self-regulated tribes such as the Mississippi Band of Choctaw.

(b) AUTHORIZATION OF APPROPRIATIONS.—Section 19 of the Indian Gaming Regulatory Act (25 U.S.C. 2718) is amended—

(1) in subsection (a), by striking "such sums as may be necessary" and inserting "for fiscal year 1998, and for each fiscal year thereafter, an amount equal to the amount of funds derived from the assessments authorized by section 18(a) for the fiscal year immediately preceding the fiscal year involved,"; and

(2) by striking subsection (b) and inserting the following: "(b) Notwithstanding section 18, there are authorized to be appropriated to fund the operation of the Commission, $2,000,000 for fiscal year 1998, and $2,000,000 for each fiscal year thereafter. The amounts authorized to be appropriated in the preceding sentence shall be in addition to the amounts authorized to be appropriated under subsection (a).".

Exhibit ___A___ page __4__ of __4__