UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

RECEIVED
US ATTORNEY OFFICE
'00 SEP 7 PM 4 37

FILED
SEP 07 2000
UNITED STATES DISTRICT C...
DISTRICT OF ALASKA

| | |
|---|---|
| NORTHWEST EXPLORATIONS JOINT VENTURE, a Joint Venture,<br><br>Plaintiff,<br><br>vs.<br><br>BRUCE BABBITT, Secretary of the Interior, DEPARTMENT of the INTERIOR, and the NATIONAL PARK SERVICE,<br><br>Defendants. | Case No. A99-0643 CV (JWS)<br><br>ORDER FROM CHAMBERS<br><br>[Re:  Motion to Dismiss Docket 6] |

## I. MOTIONS PRESENTED

At docket 6, defendants Bruce Babbitt ("Babbitt"), Department of the Interior ("Interior") and the National Park Service ("Park Service") move to dismiss. Plaintiff Northwest Exploration Joint Venture ("NWE") opposes and Babbitt responds. Oral argument has not been requested nor would it materially aid the court.

## II. BACKGROUND

This is a takings case that involves 18 patented and 99 unpatented mining claims (collectively known as the "Orange Hill" claims) that are located in Wrangell-St. Elias National Park ("Wrangell-St. Elias"). The 18 patented claims cover 363.23 acres while the 99 unpatented claims cover approximately 1600 acres. Because the claims are in Wrangell-St. Elias, they are within the jurisdiction of the Park Service. They are

EXHIBIT 2
Page 1 of 19

19

also subject to the Mining in the Parks Act.[1] The gravamen of NWE's claims is that defendants, by refusing to allow commercial mining operations in Wrangell-St. Elias, have committed a taking.

The Mining in the Parks Act authorizes the Secretary of the Interior to promulgate regulations concerning mining operations in national parks and subjects all such activities within the national parks to those regulations.[2] Interior's regulations are codified at 36 C.F.R. Part 9. They specify that no mining operations shall be conducted on lands within any national park until a plan of operations is submitted to the superintendent of the park in which the claim or claims are located and the plan is approved by the regional director who has jurisdiction over that park.[3] At a minimum, the plan must include:

> (1) The names and legal addresses of the following persons: The operator, the claimant if he is not the operator, and any lessee, assignee, or designee thereof;
>
> (2) A map or maps showing the proposed area of operations; existing roads or proposed routes to and from the area of operations; areas of proposed mining; location and description of surface facilities, including dumps;
>
> (3) A description of the mode of transport and major equipment to be used in the operations;
>
> (4) A description of the proposed operations and an estimated timetable for each phase of operations and the completion of operations;

---

[1] 16 U.S.C. §§ 1901-1912.

[2] 16 U.S.C. § 1902.

[3] 36 C.F.R. § 9.9(a).

(5) The nature and extent of the known deposit to be mined. When the claim is located in a National Monument in Alaska and is unpatented, a completed Supplemental Claim Information Statement shall be submitted describing the quantity, quality, and any previous production of the deposit;

(6) A mining reclamation plan demonstrating compliance with the requirements of § 9.11;

(7) All steps taken to comply with any applicable Federal, State, and local laws or regulations, including the applicable regulations in 36 C.F.R., Chapter I;

(8) In units subject to the surface disturbance moratorium of section 4 of the Act and § 9.4, proof satisfactory to the Regional Director that the surface of the area on which the operation is to occur was significantly disturbed for purposes of mineral extraction prior to February 29, 1976, or if the area was not so disturbed, proof, including production records for the years 1973, 1974, and 1975, that new disturbance is necessary to maintain an average annual rate of production not to exceed that of the years 1973, 1974, and 1975;

(9) An environmental report analyzing the following:

  (i) The environment to be affected by the operations,

  (ii) The impacts of the operations on the unit's environment,

  (iii) Steps to be taken to insure minimum surface disturbance,

  (iv) Methods for disposal of all rubbish and other solid and liquid wastes,

  (v) Alternative methods of extraction and the environmental effects of each,

  (vi) The impacts of the steps to be taken to comply with the reclamation plan, and

(10) Any additional information that is required to enable the Regional Director to effectively analyze the effects that the operations will have on the preservation, management and public use of the unit, and to make a decision regarding approval or disapproval of the plan of operations and

issuance or denial of the access permit.[4]

Plans must also consider the particular park's "Statement for Management and other planning documents, and activities to control, minimize or prevent damage to the recreational, biological, scientific, cultural, and scenic resources of the unit."[5]

The regulations allow regional directors 60 days to conduct an environmental assessment and to take some action.[6] Should an applicant disagree with a regional director's decision, 30 days are provided for an appeal to the regional director or, if unsuccessful, to the Director of the Park Service.[7] The regional director can either reverse his or her earlier decision or prepare a written statement that explains the original decision and his or her reasons therefor.[8] The written statement is forwarded to the Director of the Park Service with a copy to the applicant who has 20 days to prepare exceptions thereto.[9] The Director of the Park Service has 45 days from the receipt of those exceptions to issue a final decision on the appeal.[10]

In July 1985, Judge von der Heydt issued a preliminary injunction in *Northern*

---

[4] 36 C.F.R. § 9.9(b).

[5] 36 C.F.R. § 9.9(c).

[6] 36 C.F.R. § 9.10(b). The regulations note four possible actions: (1) approve or reject the plan; (2) require changes to the plan, (3) notify the applicant that more time is needed to review the plan, or (4) notify the applicant that the plan cannot be reviewed until 45 days after an EIS is completed for the particular park.

[7] 36 C.F.R. § 9.14(a).

[8] *Id.*

[9] *Id.*

[10] 36 C.F.R. § 9.14(d).

EXHIBIT 2
Page 4 of 19

*Alaska Envt'l Center v. Hodel*[11] that enjoined the Park Service from approving plans of operations for mining and related activities in Alaska's national parks until the Park Service complied with its mining regulations and prepared an environmental impact statement ("EIS") that considered the cumulative impacts of all mining operations in each park.[12]

The Park Service completed an EIS for Wrangell-St. Elias in May 1990. A Record of Decision ("ROD") was issued August 21, 1990. Therein the Park Service chose the acquisition of all mining claims within Wrangell-St. Elias as the "most environmentally preferred" alternative for dealing with existing claims.[13] To implement this plan, the Park Service was to establish an acquisition plan "to acquire all patented and valid unpatented claims in Wrangell-St. Elias. . . ."[14] With the issuance of the ROD, the Park Service satisfied the obligations required by Judge von der Heydt's injunction and the injunction was lifted in January 1991.

It is undisputed that NWE last filed a plan of operations for any of its claims on August 10, 1981.[15] The Park Service temporarily approved that plan on November 5,

---

[11] 1985 WL 19992, 15 Envt'l L. Rep. 21,048 (D. Alaska July 24, 1985), *aff'd*, 803 F.2d 466 (9th Cir. 1986).

[12] Docket 10 at 4 and exh. C at 4-5.

[13] *Id.*, exh. C at 4.

[14] *Id.*

[15] *See* docket 6, exh. A at 8-14.

1981.[16] It is also undisputed that the Bureau of Land Management ("BLM") determined in a 1988 decision that NWE abandoned the 99 unpatented claims as a matter of law because it never filed proof of annual assessment work for 1986 as required by 43 C.F.R. § 3833.2-1(b)(1).[17]

NWE filed this lawsuit on December 22, 1999. The complaint alleges that defendants' interpretation of Judge von der Heydt's 1985 preliminary injunction as precluding commercial mining operations in Wrangell-St. Elias Park and their subsequent decision not to approve such operations while it prepared an EIS for the Park constituted a taking of their mining claims in violation of the Fifth Amendment.[18] In the present motion, defendants contend that the court lacks subject matter jurisdiction because NWE has not filed a plan of operations for any of its claims since 1981 and therefore none of its legal arguments are ripe.[19] Defendants also argue that NWE's takings claim should be dismissed with respect to the unpatented claims because the BLM determined that NWE abandoned those claims by failing to file a 1986 annual affidavit of labor.[20] NWE argues the matter is ripe for review because any attempt to file a plan of operations would be futile in light of the Park Service's stated opposition to

---

[16] See id., exh. A at 19-22. Only temporary approval was given because the claims were unpatented. Id. at 19.

[17] See docket 6, exh. B at 4-5.

[18] Docket 1, ¶¶ 19, 29 at 6,8.

[19] Docket 6 at 11.

[20] Id. at 11-13.

mining.[21] In the alternative, NWE requests that the court reserve judgment on the present motion until NWE has had an opportunity to conduct discovery as to defendants' decision to preclude mining in Wrangell-St. Elias.[22] NWE does not address defendants' abandonment argument.

### III. STANDARD OF REVIEW

A Rule 12(b)(1) motion may raise a facial or factual challenge to the court's subject matter jurisdiction.[23] A facial challenge is directed at the legal sufficiency of a claim.[24] The burden of proof is on the party asserting jurisdiction.[25] When assessing a Rule 12(b)(1) facial challenge to the court's subject matter jurisdiction, the non-moving party receives the same protections as those under a Rule 12(b)(6) motion, and the court applies a standard comparable to that used for Rule 12(b)(6) motions.[26] The court "will accept the [non-moving party's] allegations as true, construing them most favorably to the [non-moving party], and will not look beyond the face of the complaint

---

[21] Docket 10 at 10-16. Defendants frame their argument as a ripeness argument while NWE frames its opposition in terms of exhaustion. For reasons more fully discussed below, the court believes ripeness is the issue.

[22] Id. at 18-19.

[23] 2 James W. Moore, *Moore's Federal Practice*, § 12.30[4] at 12-38 (3d. ed. 1997)("*Moore*").

[24] Id.

[25] 5A Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure*, § 1350, at 226 (2d ed. 1990)("*Wright*").

[26] *Moore*, § 12.30[4] at 12-38 n.12.

to determine jurisdiction."[27] A factual challenge goes to the court's power to hear a case and requires the court to weigh the evidence to confirm its jurisdiction.[28] In reviewing a factual attack, allegations in the complaint do not enjoy a presumption of truthfulness and a court may consider affidavits, documents and other evidence pertinent to the court's jurisdiction.[29] Under either a facial or factual attack, the court will not dismiss a claim under 12(b)(1) unless the claim has no merit.[30]

## IV. DISCUSSION

### A. Facial or Factual Attack

Defendants argue that their motion presents a factual attack on NWE's complaint and therefore the allegations therein are not entitled to a presumption of truthfulness. Specifically, defendants challenge the allegations in paragraphs 19[31] and 20 which, in pertinent part, provide,

> 19. The Park Service construed the preliminary injunction in a fashion that precluded mining of the Northwest Exploration claims.
>
> * * * * *
>
> 20. At some time during or after July 1985, subsequent to the issuance of the preliminary injunction, the Park Service decided that, pending completion of an Environmental Impact Statement ("EIS"), it would not approve commercial mining operations in Wrangell-St. Elias Park and Preserve

---

[27] *Moore*, § 12.30[4] at 12-38-12-39.

[28] *Moore*, § 12.30[4] at 12-39-12-40.

[29] *Moore*, § 12.30[4] at 12-38-12-40.

[30] *Moore*, § 12.30[4] at 12-38 n.12.

[31] Defendants cite to paragraph 18, but discuss paragraph 19. From the context of the argument the court assumes defendants meant to cite to paragraph 19.

that might have environmental impacts. Defendants contend these allegations are not substantiated by any evidence.[32]

A factual attack is discussed in *St. Clair v. City of Chico*.[33] In that case, real estate developers appealed a decision dismissing their civil rights complaint against the City of Chico and Butte County. The developers alleged that the defendants' refusals either to connect their proposed development project to an existing sewer system or to allow them to build their own treatment facility constituted a taking. In its underlying motion to dismiss, the City of Chico contested a factual allegation in the complaint that approval of the sewer connection was all but complete before a dispute between it and Butte County arose that precluded the approval. In addition, both the City of Chico and Butte County (the county separately moved to dismiss) contested a factual allegation that the parties had reached an impasse regarding concessions that might have been made that would have allowed for the approval of the sewer connection. The district court granted the motions to dismiss because it found there never was a final decision rejecting the developers' application and the developers' failure to attempt annexation belied their argument that annexation would have been futile. The Ninth Circuit reviewed the evidence considered by the district court and affirmed the district court's conclusion that the takings claim was not ripe because neither the City of Chico nor Butte County had reached final decisions regarding the

---

[32]Docket 6 at 7.

[33]880 F.2d 199 (9th Cir. 1989).

two proposals for obtaining sewer service.[34]

Defendants' attack is distinguishable from the attack discussed in *St. Clair*. It is undisputed that NWE never filed a plan of operations covering any of its claims. Defendants cite to that shortcoming and take the position that, as a matter of law, NWE's claims are not ripe and NWE cannot avail itself of the futility exception.[35] Consequently, the instant motion does not hinge upon the resolution of a factual dispute. Rather, defendants' motion presents a facial challenge to the complaint. As such, the court will not look beyond the face of the complaint and will accept NWE's allegations as true.[36]

### B. Ripeness and Futility

The ripeness doctrine is premised on both constitutional and prudential concerns.[37] Article III limits the power of the federal judiciary to cases or controversies. Where a case or controversy that injures the plaintiff does not yet exist, the ripeness doctrine precludes judicial intervention. Whether this point has been reached in any given dispute is a threshold question that goes to the court's subject matter jurisdiction.[38] In terms of prudential concerns, the ripeness requirement promotes judicial economy and efficiency. Because a court cannot determine whether a taking

---

[34] *Id.*, at 204.

[35] *See, e.g.*, docket 6 at 3-4, 5, 11; docket 14 at 2, 3, 4, 8, 19.

[36] *See* text *supra* at note 28.

[37] *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 733 n.7, 117 S. Ct. 1659, 1664 n.7 (1997).

[38] *Southern Pac. Transp. Co. v. City of Los Angeles*, 922 F.2d 498, 502 (9th Cir. 1990).

has occurred unless the extent of permissible use is established, plaintiffs must show that they have obtained a final determination as to the uses of the land that would be permissible.[39]

Defendants correctly point out that this case is controlled by *United States v. Vogler*.[40] Vogler, a miner with claims in the Yukon-Charley Rivers National Preserve, challenged regulations that prohibited him from mining his claims without first obtaining an access permit and the Park Service's approval of a plan of operations. Vogler argued, among other things, that enforcement of the regulations constituted a taking of his mining claims in violation of the Fifth Amendment. The Ninth Circuit held that Vogler's takings claim was not ripe because he had not applied for an access permit or submitted an operations plan and therefore the Park Service had not reached a final decision to reject his application or to disapprove his plans.[41]

The *Vogler* court specifically relied on *Williamson County Regional Planning Comm'n v. Hamilton Bank*.[42] In *Williamson County* the Supreme Court addressed the ripeness of a takings claim brought by a developer whose predecessor in interest had been unable to get a development plan approved by the regional planning commission with jurisdiction over the property at issue. The Court recounted its takings discussions

---

[39] *Southern Pac. Transp. Co.*, 922 F.2d at 502.

[40] 859 F.2d 638 (9th Cir. 1988), *cert. denied* 488 U.S. 1006 (1989).

[41] *Id.* at 642.

[42] 473 U.S. 172, 185 S. Ct. 3108 (1985).

11

EXHIBIT 2
Page 11 of 19

from earlier cases[43] and concluded that a regulatory takings claim in a land-use context could not be ripe unless the relevant government agency had first considered and turned down a development plan and subsequent requests for a variance.[44] The Supreme Court opined that a rigid ripeness rule was necessary because landowners, if forced to obtain a final agency decision, might obviate the need for judicial intervention by reaching a mutually acceptable solution with the agency, and because no court would be able to determine whether the landowners had been deprived of all economic benefit from their property unless an agency had first issued a final decision as to how it is constraining the particular parcel at issue.[45]

The Supreme Court revisited this issue in *Suitum v. Tahoe Regional Planning Agency*.[46] In *Suitum*, the Supreme Court again had to address the takings claim of a landowner. The landowner, wishing to construct a house on her parcel, had applied to the regional planning agency with jurisdiction over her parcel for a building permit. The agency denied the application because the land was located within a "stream environment zone" for which the applicable land-use ordinance permitted no additional land coverage or disturbances. The landowner's takings claim followed. The Supreme Court held that the landowner's claim was ripe because the relevant ordinance stripped

---

[43]Including *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 101 S. Ct. 2352 (1981); *Agins v. City of Tiburon*, 447 U.S. 255, 100 S. Ct. 2138 (1980); *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 98 S. Ct. 2646 (1978).

[44]*Williamson County Regional Planning Comm'n*, 473 U.S. at 186-94, 185 S. Ct. at 3116-20.

[45]*Id.*, 473 U.S. at 186-91, 185 S. Ct. at 3116-19.

[46]520 U.S. 725, 733 n.7, 117 S. Ct. 1659, 1664 n.7 (1997).

the planning agency of any discretion in considering the permit application at issue.[47]

In reaching its conclusion, the Court explained that the need for finality in *Williamson County* was based on two principles: first, a final agency action helps reveal how the land in question might be used and, second, it provides land-use boards the opportunity to relax the regulations they administer with respect to individual parcels of property.[48] These principles were derived from the Court's recognition that no court could make "a sound judgment about what use would be allowed . . . by asking whether a parcel's characteristics or a proposal's details facially conform to the terms of the general use regulations."[49] Thus, the court concluded, that the need for a final agency action is most important where the agency's "flexibility or discretion may be brought to bear on the permissible use of property. . . ."[50] These concerns were overcome in *Suitum* because the relevant ordinance was clear and the planning agency had no discretion to wield.

*Suitum* can best be explained as presenting an exception to *Williamson County*: the prudential concerns implicated by the ripeness doctrine are satisfied where there is no question about how the agency would treat the particular land in question.[51] *Suitum*

---

[47] *Id.*, 520 U.S. at 739, 117 S. Ct. at 1667.

[48] *Id.*, 520 U.S. at 738-39, 117 S. Ct. at 1667. The Ninth Circuit has reiterated these two principles in a more recent takings case, *Richardson v. City and County of Honululu*, 124 F.3d 1150, 1165 (9th Cir. 1997).

[49] *Id.*, 520 U.S. at 738-39, 117 S. Ct. at 1667.

[50] *Id.*

[51] *Id.*, 520 U.S. at 739, 117 S. Ct. 1667.

EXHIBIT 2
Page 13 of 19

is less helpful as to the Article III underpinnings of the ripeness doctrine because it does not explain when a case or controversy exists in the context of a takings claim.[52] It is also less helpful to NWE than NWE's briefing would suggest because in *Suitum* there was an application which had been denied. In those respects, several Ninth Circuit cases are instructive.

In *Kinzli v. City of Santa Cruz*,[53] landowners challenged the constitutionality of a land-use regulation that limited the uses of greenbelt land including the property they owned. The landowners contended that the regulation constituted a taking of their property. The Ninth Circuit held that the landowners' takings claims were not ripe because they had never submitted a development plan or applied for a land-use permit.[54] Specifically, the court, citing *Williamson County*, held that a landowner's as-applied takings challenge "does not, as a rule, present a concrete controversy ripe for adjudication unless [the landowners] have first submitted a development plan or applied for a land-use permit."[55] The mandatory language used in the *Kinzli* decision is telling and must be interpreted as requiring the submission of a land-use plan or permit application as a prerequisite to Article III ripeness and not just as a factor directed to prudential ripeness concerns.

---

[52]The Supreme Court only considered prudential ripeness principles because the planning agency did not dispute that the landowner's claim presented a case or controversy. *Id.*, 520 U.S. at 733 n.7, 117 S. Ct. 1659, 1664 n.7 (1997).

[53]818 F.2d 1449 (9th Cir. 1987).

[54]*Id.* at 1453.

[55]*Id.*

*Southern Pacific Transport Co. v. City of Los Angeles*[56] is to the same effect. In that case, the Ninth Circuit, again faced with a Fifth Amendment challenge to a local land-use decision, held that the two *Williamson County* ripeness prerequisites were mandatory to any as-applied takings challenge because ripeness "is determinative of jurisdiction."[57] In other words, "[i]f a claim is unripe, federal courts lack subject matter jurisdiction and the complaint must be dismissed."[58]

The court is convinced that *Williamson County*'s ripeness analysis, as interpreted by the Ninth Circuit, applies to this case and NWE does not argue that it does not. Rather NWE contends that its takings claim is ripe because it would have been and still would be futile to submit a plan of operations covering any of its mining claims in Wrangell-St. Elias. In its complaint, NWE makes the following factual allegations,

> 22. Mining the Northwest Explorations claims necessarily would have engendered environmental impacts and, thus, submission of a Plan of Operation for this commercial mining operation after July 1985 was futile.
>
> 23. Upon information and belief, after July 1985, the Park Service never approved and would not have approved a Plan of Operation for large-scale commercial mining in Wrangell-St. Elias National Park that would disturb unmined land or otherwise give rise to environmental impacts.

* * * * *

---

[56] 922 F.2d 498 (9th Cir. 1990).

[57] *Id.* at 502-03.

[58] *Id.*

> 26. [After issuance of the ROD], the Park Service continued to prohibit commercial mining in the Wrangell-St. Elias National Park and Preserve. While the Park Service initially did not communicate this policy decision to the mining community, in later years, on information and belief, the Park Service's position was conveyed through informal and more formal communications. Northwest Explorations recognized that mining would under no circumstances be permitted in Wrangell-St. Elias National Park and Preserve. Because of the environmental effects that would necessarily accompany an exploration and mining operation for the Orange Hill claims, Northwest Explorations further understood that any attempts to secure the permission of the National Park Service to mine the Orange Hill claims would be futile.
>
> 27. After the Park Service completed its EIS and decided permanently to bar commercial mining in Wrangell-St. Elias National Park and Preserve, it would have been futile for Northwest Explorations to pursue approval of a Plan of Operation to mine the patented claims.
>
> * * * * *
>
> 29. The Park Service's decision in 1985 to decline to approve commercial mining operations during preparation of the EIS, which was confirmed and continued by its decision after the Final EIS and its accompanying Record of Decision were issued in 1990, to decline to approve commercial mining operations that give rise to environmental impacts, effected a taking of Northwest Explorations' property interest in the claims. The taking deprived Northwest Explorations of all economic value attributable to the claims.

Taking these undisputed allegations as true, NWE's complaint charges that any attempt to submit a plan of operations would be futile because the Park Service has predetermined that it will not approve any commercial mining operation in Wrangell-St. Elias.[59]

---

[59]NWE supports its futility argument with evidence that details the Park Service's handling of mining claims in Denali National Park. This evidence is unhelpful for two reasons. First, in analyzing a facial challenge to jurisdiction the court does not look beyond the face of the complaint. Moore, § 12.30[4] at 12-39 - 12-40. Second, accepting NWE's evidence would

16

EXHIBIT 2
Page 16 of 19

The Ninth Circuit recognizes a limited futility exception and will consider the ripeness doctrine satisfied in land-use regulatory takings cases where the landowner establishes the futility of pursuing any of the steps necessary to obtaining a final decision.[60] This exception would seem to encompass the allegations in NWE's complaint. However, the limited exception further requires at least one development proposal or, as would be the case here, one plan of operations.[61] This prerequisite makes the futility exception inapplicable to NWE's takings claim.

The court is unaware of and NWE has not pointed to any precedent that waives the one meaningful plan or application prerequisite to the futility exception.[62] The closest case on point is *Eastern Minerals Int'l, Inc. v. United States*,[63] in which the court

---

require the court to accept the premise that the Park Service would treat mining claims in the two parks exactly alike. While NWE alleges that "there is no reason to believe that the Government's policies would differ between the two parks," docket 10 at 5 n.3, the court will not draw such a conclusion from the current record. In the very least it should be noted that the claims in Denali National Park all appear to involve gold claims while NWE's claims are copper, molybdenum, zinc, gold and silver claims. Docket 1, ¶ 10 at 3-4. Mining these deposits would involve two very different mining techniques and would entail different environmental consequences. This difference alone is sufficient to distinguish the claims NWE attempts to compare.

[60] *Del Monte Dunes at Monterrey, Ltd*, 920 F.2d at 1501.

[61] *Id.*; *Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227, 1232 (9th Cir. 1994); *Southern Pacific Transp. Co.*, 992 F.2d at 504; *Herrington v. Count of Sonoma*, 857 F.2d 567, 569 (9th Cir. 1988), cert denied, 489 U.S. 1090, 109 S. Ct. 1557 (1989); *Kinzli*, 818 F.2d at 1454-55.

[62] NWE cites to three cases, *Wieler v. United States*, *Kantishna Mining Co. v. Babbitt* and *Martinek v. United States*, two from this court, in which the claimants successfully availed themselves of the futility exception. These cases are unhelpful because, in each, at least one plan of operations or application for mining had been submitted and the courts could more readily conclude that an Article III case or controversy existed. This court cannot.

[63] 36 Fed. Cl. 541(1996). While this decision is not binding on the court, it is persuasive in light of the factual similarities to this case.

of federal claims refused to extend the futility exception to encompass a takings claim by a mining company that had not submitted a mining permit application despite the fact that a similarly situated company had submitted several applications and had been denied as to each. The court of federal claims held,

> [a]lthough [the company] may have faced the same delay [the unsuccessful applicant] endured [in receiving a decision from the government], this is the sort of speculation that the ripeness doctrine seeks to avoid. Each plaintiff must satisfy the threshold requirement of a single meaningful application to maintain the futility exception. We do not wish to read the meaningful proposal requirement so narrowly as to allow legal technicalities to undermine common-sense justice, but the Government was entitled to have meaningful notice of [the company's] potential interest.[64]

In light of the Ninth Circuit authority discussed above, the court finds *Eastern Minerals Int'l, Inc.* to be persuasive.[65] NWE cannot avail itself of the futility exception without first submitting a plan of operations that provides the Park Service an opportunity to address NWE's mining claims in Wrangell-St. Elias.

### C. Additional Discovery

In light of the above holding, the court need not reach NWE's request for additional discovery. Additional discovery would not alter the result.

### D. Unpatented Claims

Defendants argue in their memorandum in support of the present motion that

---

[64] *Id.* at 548 (citations omitted).

[65] The case is particularly compelling in light of NWE's attempts to use the Park Service's actions with respect to various mining claims in Denali as evidence of the futility of submitting a plan of operations for its claims in Wrangell St. Elias. This evidence is discussed *supra* at note 59.

NWE's takings claim must be dismissed with respect to the 99 unpatented claims because those claims were abandoned in 1986 and therefore could not be taken.[66] In its reply memorandum, defendants' clarify their argument and assert that the 1986 abandonment precludes any taking claim because the injunction imposed by Judge von der Heydt in 1985 could not, as a matter of law, trigger a taking.[67] The court need not consider either argument in light of the above holding.

### V.  CONCLUSION

For the above reasons, defendants' motion at docket 6 is **GRANTED**. This case is **DISMISSED** without prejudice for lack of jurisdiction.

DATED at Anchorage, Alaska this 7th day of September, 2000.

JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE

---

[66]Docket 6 at 11-13. Defendants' argument more appropriately fits a 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted.

[67]Docket 14 at 12-15.